02-11-174-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00174-CR

 

 


 
 
 Victor Stovall
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 362nd
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

 

          Appellant
Victor Stovall appeals his conviction following a jury trial for felony driving
while intoxicated (DWI).[2]  The jury heard evidence
that officers responded to a citizen call at approximately 2:30 a.m. on
December 25, 2009.  Appellant’s vehicle was stuck in the ice in an apartment
complex parking lot.  He was revving the engine, spinning the tires, and
disturbing others in the complex.  An officer arrested Appellant for DWI after
an investigation.

          Appellant
contends in his first two issues that the trial court erred by denying his
motion to suppress because his initial detention was not supported by
reasonable suspicion and because his arrest was not supported by probable
cause.  He argues in his third and fourth issues that the trial court abused
its discretion by admitting punishment-phase evidence of an extraneous offense.
 Appellant does not challenge the sufficiency of the evidence.  We affirm.

II.  Motion to
Suppress

 

          Appellant
argues in his first and second issues that the trial court erred by denying his
motion to suppress evidence because his initial detention was not supported by
reasonable suspicion and because his arrest was not supported by probable
cause.  The State responds that the officer’s initial contact with Appellant
was a consensual encounter that did not require reasonable suspicion and that Appellant’s
arrest was supported by probable cause.

A. 
Standard of Review

 

          We
review a trial court’s ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  We give almost total deference to a trial court’s rulings on
questions of historical fact and application-of-law-to-fact questions that turn
on an evaluation of credibility and demeanor, but we review de novo
application-of-law-to-fact questions that do not turn on credibility and
demeanor.  Amador, 221 S.W.3d at 673; Estrada v. State, 154
S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State, 68 S.W.3d 644,
652–53 (Tex. Crim. App. 2002).

          When,
as here, the record is silent on the reasons for the trial court’s ruling, or
when there are no explicit fact findings and neither party timely requested
findings and conclusions from the trial court, we imply the necessary fact
findings that would support the trial court’s ruling if the evidence, viewed in
the light most favorable to the trial court’s ruling, supports those findings. 
State v. Garcia-Cantu, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); see
Wiede v. State, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).  We then review
the trial court’s legal ruling de novo unless the implied fact findings
supported by the record are also dispositive of the legal ruling.  State v.
Kelly, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

B. 
Applicable Facts

 

          At
the pretrial suppression hearing, Lewisville Police Officer Jonathan Wolk
testified that he was on patrol on December 25, 2009, when he received a
dispatch at approximately 2:25 a.m. concerning a “traffic hazard.”  The caller
reported that a person in the parking lot of the Autumn Breeze apartment
complex was “revving his engine vehemently” and that the noise was keeping his
children awake.  Officer Wolk testified that it took him ten to fifteen minutes
to respond because of icy conditions on the roadways.

          When
he arrived, Officer Wolk saw a Mercury Grand Marquis vehicle.  He testified
that it was “in the driveway running its engine, spinning its tires; and it
appeared to be stuck on ice.”  Officer Wolk described his initial interaction
with Appellant as follows:

As I pulled in front
of it, it continued to spin its tires, so I initiated my lights, hoping to get
the driver to stop accelerating because by chance if it happened to grab
traction, it might have went straight into me.  I turned my lights on and
pulled over to the side, just in case he didn’t stop revving the engine, and I
exited my vehicle.

 

Officer
Wolk further testified that he stopped his vehicle beside Appellant’s vehicle
but that his patrol car was facing the opposite direction.  Appellant stopped
revving his engine when Officer Wolk exited his vehicle.

          Officer
Wolk approached the driver’s side of Appellant’s vehicle and made contact with
Appellant.  He testified that the window on Appellant’s vehicle was down and
that he began speaking with Appellant as he exited his patrol car.  Officer
Wolk further testified, “As I was walking up to the driver’s seat, and he
looked out at me, I noticed his eyes were droopy, almost half open.  As I got
closer, I noticed a portion that I could see was bloodshot and appeared to be
glassy.”  Officer Wolk also testified that when he first started speaking with
Appellant, he noticed that Appellant’s speech was slurred and that his answers
were “very delayed” rather than conversational.  He also noticed “a moderate
odor of alcohol coming from [Appellant’s] breath.”

          Officer
Wolk asked Appellant to exit the vehicle, and Appellant complied.  Officer Wolk
spoke with Appellant outside the vehicle, and Appellant said that he had consumed
four beers.  Appellant did not state when he had consumed the beers but told
Officer Wolk that he drank the beers earlier at his apartment.  Appellant also
told Officer Wolk that he lived in one of the Autumn Breeze apartments.

          Appellant
informed Officer Wolk that he had taken two Darvocets that day for back pain.  When
Officer Wolk asked Appellant when he had taken the Darvocets, Appellant paused
and then said, “I am high.”  Officer Wolk asked Appellant “what he was high
on,” and Appellant responded, “I’m sorry; I misspoke.”

          Officer
Wolk testified that he talked with Appellant about why he was outside at 2:30
a.m. on Christmas, and Appellant said that he had purchased the vehicle thirty
minutes earlier on the south side of the apartment complex and was trying to
get it to his apartment on the north side of the complex.  However, Officer
Wolk testified that he had responded to an incident at Appellant’s apartment
about a month earlier and recalled that Appellant had the same vehicle at that
time.

          Officer
Wolk testified that he called a DWI officer to investigate the possibility that
Appellant was driving while intoxicated.  Officer Wolk did not personally
conduct any field sobriety tests, nor did he issue Appellant any traffic
citations or place him under arrest.

          Officer
Christopher Clements testified that he responded to a radio call from Officer
Wolk at approximately 2:45 a.m. on December 25, 2009.  Officer Clements
testified that Officer Wolk informed him of the reason for the initial dispatch
and what he had observed of Appellant, including the moderate odor of alcohol
on Appellant’s breath and Appellant’s slurred speech and red, glassy, and
droopy eyes.  Officer Clements testified that he made contact with Appellant
“relatively quickly” and that he initially observed “[p]retty much the same
thing[s] Officer Wolk saw.”  He also testified that Appellant gave very
different answers to similar questions and that he had trouble hearing
Appellant at times because of Appellant’s slurred speech.  Appellant also
swayed while walking and standing.

          Officer
Clements testified that Appellant initially told him that he was just driving
around the apartment complex but that Appellant later told him that he had
started his car to warm it up before driving to work, saying that he had to be
at work at 6:00 a.m.  However, Appellant did not know the time when asked.

          Officer
Clements, rather than going through standard field sobriety tests because of
the icy conditions, began alphabet and counting tests with Appellant.  Appellant
was initially uncooperative with Officer Clements’s request that he recite the
alphabet, saying, “If you’re going to take me to jail, just take me to jail.”  Appellant
did, however, begin reciting the alphabet, but he repeated the letter “E” twice
and stopped at the letter “F” in order to point out another car that was stuck
in the ice.  Officer Clements testified that Appellant thereafter refused to
perform any other sobriety tests.[3]  At that point, Officer
Clements arrested Appellant, handcuffed him, put him into the back seat of the
police car, and read him his statutory warnings.  With Appellant in the back
seat, Officer Clements ran Appellant’s driver’s license number and learned that
Appellant had two previous DWI convictions.  Because of the prior convictions,
Officer Clements testified that he drove Appellant to the hospital for a
mandatory blood draw.

          On
cross-examination, Officer Clements denied that Appellant was under arrest by
the time he arrived on scene and testified that if Appellant “had done
perfectly” on all the field sobriety tests, he would have been released from
detention.

C. 
Applicable Law

 

1.  Consensual Encounter

 

          The
Texas Court of Criminal Appeals has recognized three categories of interactions
between police officers and citizens:  encounters, investigative detentions,
and arrests.  State v. Perez, 85 S.W.3d 817, 819 (Tex. Crim. App.
2002).  Unlike investigative detentions and arrests, which are seizures for
Fourth Amendment purposes, an encounter is a consensual interaction that the
citizen is free to terminate at any time.  See Gurrola v. State, 877
S.W.2d 300, 302–03 (Tex. Crim. App. 1994).  The dispositive question is whether
the totality of the circumstances shows that the police conduct at issue would have
caused a reasonable person to believe that he was free to decline the officer’s
requests or otherwise terminate the encounter.  Florida v. Bostick, 501
U.S. 429, 439–40, 111 S. Ct. 2382, 2389 (1991); State v. Velasquez, 994
S.W.2d 676, 679 (Tex. Crim. App. 1999).  If a reasonable person would feel free
to terminate the encounter, the police-citizen contact is merely a consensual
encounter and does not implicate the Fourth Amendment.  See United States v.
Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002); Florida v.
Royer, 460 U.S. 491, 497–98, 103 S. Ct. 1319, 1324 (1983); Velasquez,
994 S.W.2d at 679.

          Circumstances
that may indicate that a police-citizen interaction is a seizure, rather than a
consensual encounter, include the threatening presence of several officers, the
display of a weapon by an officer, some physical touching of the person of the
citizen, or use of language or tone of voice indicating that compliance with
the officer’s requests might be compelled.  United States v. Mendenhall,
446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980).  Absent some such evidence,
however, otherwise inoffensive conduct between a citizen and a police officer
cannot, as a matter of law, amount to a seizure of that person.  Id. at
555, 100 S. Ct. at 1877.

          2. 
Reasonable Suspicion

 

          “No
bright-line rule governs when a consensual encounter becomes a seizure.”  State
v. Woodard, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011).  “Generally,
however, when an officer through force or a showing of authority restrains a citizen’s
liberty, the encounter is no longer consensual.”  Id.  “This is the
point at which an encounter becomes a detention or arrest, both of which are
seizures under the Fourth Amendment.”  Id.  “Thus, Fourth Amendment
scrutiny becomes necessary.”  Id.

          A
temporary investigative detention is permissible provided the officer has a
reasonable suspicion that the individual has engaged in criminal activity.  See
Terry v. Ohio, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968).  Reasonable
suspicion exists when an officer has specific articulable facts that, when
combined with rational inferences from those facts, would lead him reasonably
to conclude that a particular person is, has been, or soon will be engaged in
criminal activity.  Ford v. State, 158 S.W.3d 488, 492 (Tex. Crim. App.
2005).

          3. 
Probable Cause

          Under
the Fourth Amendment, a warrantless arrest is unreasonable per se unless
it fits into one of a “few specifically established and well delineated
exceptions.”  Minnesota v. Dickerson, 508 U.S. 366, 372, 113 S. Ct.
2130, 2135 (1993); Torres v. State, 182 S.W.3d 899, 901 (Tex. Crim. App.
2005).  A police officer may arrest an individual without a warrant only if
probable cause exists with respect to the individual in question and the arrest
falls within one of the exceptions set out in the code of criminal procedure.  Torres,
182 S.W.3d at 901; see Tex. Code Crim. Proc. Ann. arts. 14.01–.02 (West
2005), .03–.04 (West Supp. 2012).

          Probable
cause for a warrantless arrest requires that the officer have a reasonable
belief that, based on facts and circumstances within the officer’s personal
knowledge, or of which the officer has reasonably trustworthy information, an
offense has been committed.  Torres, 182 S.W.3d at 901–02.  Probable
cause must be based on specific, articulable facts rather than the officer’s
mere opinion.  Id. at 902.  We use the “totality of the circumstances”
test to determine whether probable cause existed for a warrantless arrest.  Id.

D. 
Reasonable Suspicion Supported Detention

 

          Appellant
argues that he was detained immediately upon Officer Wolk’s arrival in the
parking lot, and he points to Officer Wolk’s use of his overhead lights and the
positioning of Officer Wolk’s patrol car to support his argument.  An officer’s
use of the patrol car’s emergency, flashing red and blue lights does not,
however, automatically convert an encounter into a detention, particularly when
the officer approaches a stationary vehicle.  Hudson v. State, 247
S.W.3d 780, 785 (Tex. App.—Amarillo 2008, no pet.); Franks v. State, 241
S.W.3d 135, 142 (Tex. App.—Austin 2007, pet. ref’d); Martin v. State,
104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.); see Randall v. State,
No. 10-11-00234-CR, 2012 WL 2053849, at *3 (Tex. App.—Waco June 6, 2012, pet.
filed).  Rather, the officer’s use of the flashing lights is one fact to
consider as part of the totality of the circumstances.  Randall, 2012 WL
2053849, at *3–4; see Franks, 241 S.W.3d at 142.  Thus, we consider
whether the totality of the circumstances shows that Appellant’s conduct at
issue would have caused a reasonable person to believe that he was free to
decline the officer’s requests or otherwise terminate the encounter.

          In
that regard, Officer Wolk responded to a traffic hazard dispatch at approximately
2:30 a.m. on Christmas morning after a caller reported a disturbance caused by
Appellant “revving his engine vehemently” in the apartment complex parking lot.
 Appellant’s car appeared to be stuck on the ice, and Officer Wolk testified
that he turned on his overhead lights for safety reasons so that Appellant’s
car would not lurch forward if it unexpectedly gained traction.  Although
Officer Wolk parked his car next to Appellant’s vehicle, the record does not
indicate that he parked the patrol car in a way that “boxed-in” Appellant’s
vehicle.  Appellant’s window was open when Officer Wolk arrived, and nothing in
the record suggests that Officer Wolk gave Appellant any commands or made any
other movements as a show of authority as he approached Appellant’s vehicle.

          The
evidence presented at the suppression hearing in this case is quite similar to
that presented in other cases in which our sister courts have concluded that
the initial encounter was consensual and did not require reasonable suspicion. 
See Franks, 241 S.W.3d at 142; see also Randall, 2012 WL 2053849,
at *4.  In Franks, the officer had observed the defendant’s vehicle
parked in the same location at a rest area at different times over several days
and decided to investigate.  See 241 S.W.3d at 138–39.  The officer
parked his patrol car behind the defendant’s car and activated his overhead
lights.  Id. at 139.  He approached the defendant’s car—the engine was
running—and told the driver why he had stopped to investigate.  Id.  The
driver appeared nervous and asked if she could leave, but the officer told her that
she could not leave.  Id.  The court held that the initial encounter
with the driver was consensual and did not require any justification but that
the consensual encounter escalated into a detention at the moment the officer
informed her that she could not leave.  Id. at 142.

          In
Randall, the officer observed a car parked on the side of the highway at
night with its lights on.  See 2012 WL 2053849, at *1.  The
officer pulled his patrol car behind the vehicle, turned on his overhead lights
as well as his spotlight, and approached the defendant’s vehicle.  Id. 
The driver’s window was rolled down, and the officer could hear the driver
talking to his wife on the telephone.  Id.  The court held that the
initial encounter between the officer and driver was an encounter rather than a
detention.  Id. at *5.

          Here,
Officer Wolk responded to a traffic hazard report, found Appellant’s vehicle,
turned on his overhead lights so that Appellant would stop revving the engine
and spinning the tires on the ice, parked his patrol car beside Appellant’s
vehicle, and approached Appellant’s vehicle.  Officer Wolk did not order that
Appellant roll down his window because the window was already rolled down.  We
hold that the record supports a determination that the initial interaction
between Officer Wolk and Appellant was a consensual encounter.  See
Randall, 2012 WL 2053849, at *4–5; Franks, 241 S.W.3d at
142.

          The
encounter, however, escalated into a detention when Officer Wolk asked
Appellant to exit the vehicle.  See Franks, 241 S.W.3d at 142.  Thus, Officer
Wolk could not detain Appellant beyond the initial encounter without reasonable
suspicion.  See Woodard, 341 S.W.3d at 411.  An officer conducts
a lawful temporary detention when he or she has reasonable suspicion to believe
that an individual is violating the law.  Crain v. State, 315 S.W.3d 43,
52 (Tex. Crim. App. 2010); Ford, 158 S.W.3d at 492.  Reasonable
suspicion exists when, based on the totality of the circumstances, the officer
has specific, articulable facts that when combined with rational inferences
from those facts, would lead him to reasonably conclude that a particular
person is, has been, or soon will be engaged in criminal activity.  Ford,
158 S.W.3d at 492.  This is an objective standard that disregards any
subjective intent of the officer making the stop and looks solely to whether an
objective basis for the stop exists.  Id.

          The
question, then, is whether Officer Wolk could have reasonably suspected that
Appellant was, had been, or soon would be engaged in criminal activity at the
time that he asked Appellant to exit the vehicle.  The evidence reflects that
Appellant was outside in the ice at 2:30 a.m. on Christmas morning, revving the
engine on his vehicle, and spinning its tires in the ice.  Officer Wolk
testified that the window to Appellant’s vehicle was down; that he began
speaking with Appellant as he approached after parking his patrol car; that he
noticed as he approached that Appellant’s eyes were droopy, bloodshot, and
glassy; that Appellant’s speech was slurred and very delayed; and that he
smelled a moderate odor of alcohol coming from Appellant’s breath.  We held
last year in a similar case that an officer had reasonable suspicion to temporarily
detain a person beyond an initial consensual encounter, and we described the
basis of our holding as follows:

In the early morning
hours following the July Fourth holiday, Officer Bain arrived at the scene to
see a vehicle parked on the side of a busy roadway, with its lights on, its
engine running, and Huddleston sleeping inside with two beer cans within
reach.  Immediately after waking Huddleston, Officer Bain noticed Huddleston’s
disorientation, his bloodshot and watery eyes, the odor of alcohol on his
breath, and his instability when he exited the vehicle.  Based on a totality of
the circumstances, Officer Bain had sufficient articulable facts supporting a
reasonable suspicion that Huddleston had been engaged in criminal activity.  He
was therefore justified in temporarily detaining Huddleston to conduct further
investigation.

 

Huddleston
v. State, No. 02-09-00406-CR, 2011 WL 3443597, at *4 (Tex.
App.—Fort Worth Aug. 4, 2011, pet. ref’d) (mem. op., not designated for
publication) (citations omitted).  Here, Appellant was engaged in suspicious
activity given the holiday, time of night, and icy conditions, and Officer Wolk
noticed Appellant’s slurred speech and droopy, bloodshot, and glassy eyes
before he asked Appellant to exit his vehicle.  We hold that Officer Wolk had
sufficient articulable facts that would support a reasonable suspicion that Appellant
had been engaged in criminal activity and that Officer Wolk was therefore
justified in temporarily detaining Appellant for further investigation.  The
trial court did not err by denying Appellant’s motion to suppress on this
ground, and we overrule Appellant’s first issue.

E. 
Probable Cause Supported Arrest

 

          Appellant
argues in his second issue that his warrantless arrest was not supported by probable
cause.  This court held in Hogan v. State, 329 S.W.3d 90, 96 (Tex.
App.—Fort Worth 2010, no pet.), that a strong odor of alcohol and Hogan’s
bloodshot, watery, and heavy eyes; swaying; unsteady balance; reckless driving;
and refusal to provide a breath specimen were sufficient to establish probable
cause for a DWI arrest.  Here, Appellant was revving his vehicle’s engine at
2:30 a.m. on Christmas morning in icy conditions with his window rolled down;
had slurred speech and droopy, bloodshot, and glassy eyes; swayed when standing
and walking; said he had drank four beers and had taken two Darvocets; told
Officer Wolk that he was high but later said that he had misspoken; said that
he had bought the car thirty minutes earlier; later said that he was driving
around the parking lot; even later said that he was warming his car to go to
work at 6:00 a.m. but did not know the time when asked; was generally
uncooperative with Officer Clements; and refused further field sobriety tests
after getting only to “F” of the alphabet test.  These facts, all observed by
the officers before Appellant’s warrantless arrest, were sufficient to show
probable cause that Appellant had committed DWI.  See id.; see also
Dyar v. State, 125 S.W.3d 460, 464 (Tex. Crim. App. 2003) (probable cause
to arrest where driver admitted drinking and driving, and officer smelled
alcohol and observed slurred speech, unintelligible answers, and red, glassy
eyes); Maxwell v. State, 253 S.W.3d 309, 314 (Tex. App.—Fort Worth 2008,
pet. ref’d) (citing refusal to perform field sobriety tests as factor that can
support probable cause to arrest suspect for DWI).  The trial court did not err
by denying Appellant’s motion to suppress based on the alleged absence of
probable cause to arrest, and we overrule Appellant’s second issue.

III.  Admission of
Evidence – Punishment Phase

 

          Appellant
argues in his third issue that the trial court erred by admitting testimonial evidence
relating to an extraneous offense of assault in violation of the rule stated in
Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004).  He
contends in his fourth issue that the remaining evidence of the extraneous
offense, once the inadmissible testimonial evidence is excluded from analysis,
was likewise inadmissible because it was insufficient to prove his commission
of the extraneous offense beyond a reasonable doubt.

A. 
Punishment-Phase Evidence

 

          The
State’s first witness was Tasha Whitley, a dispatcher for the Lewisville Police
Department who answers 911 calls and dispatches police, fire, and EMS personnel
when necessary.  Whitley testified that she answered a 911 call on November 15,
2009, and she described it as one of the worst she had ever had.  She
testified, “I’ve never, in the three and a half years I’ve worked, had what’s
called an open line where I just hear background noise for that long, with no
one on the phone, and that I could hear the disturbance going on.”  Whitley
also testified that the call was difficult for her because the male had said
that he would kill the female.

          The
State offered, and the trial court admitted, the recording of the 911 call, and
the State played the recording for the jury.  Whitley then testified that she
could hear three voices on the recording:  one male, one female, and one small
child.  She also testified that the female identified the male as Victor during
the recording.[4]  Near the end of the
call, the female provided Whitley with an address, and Whitley dispatched police
officers to the scene.

          This
court has listened to the sixteen-minute 911 recording that was played for the
jury.  The following can be heard on that recording:

§  A male and female
arguing;

 

§  The female calls the
male “Victor” several times;

 

§  The female repeatedly
says “get off of me” throughout much of the recording;

 

§  The male says that he
had let the female run her mouth at him for two years;

 

§  The male says, “I’m
gonna f--k you[r] head up, you hear me?  Don’t f--k with me”;

 

§  The male says, “I
will hurt your mother f--king ass”;

 

§  The male says, “I
will kill your bitch ass”;

 

§  The male tells the
female to leave him alone, but the female responds that he is the one keeping
her there;

 

§  The female says to
the dispatcher, Whitley, that the apartment address begins with 1679, that the
apartment number is 2204, that the male is in the apartment, and that it is his
apartment.

 

          Officer
Wolk was the State’s next witness.  He testified that he responded to the 911
dispatch on November 15, 2009, and that he was directed to the Autumn Breeze
apartment complex where he met the female complainant, Monique Randle, at the
apartment complex office.  She identified herself as the 911 caller, and
Officer Wolk discussed with her what had happened.  Officer Wolk testified that
Randle was crying and “sobbing fairly heavily,” that she was struggling to
breathe from crying, that he noticed red marks around her neck, and that she
told him she was in pain.  He described the marks as “going from about ear to
ear around the front of her neck [with] scratch marks going down the side of
her throat,” and the trial court admitted photographs that Officer Wolk had
taken to depict Randle’s injuries.

          Describing
the photographs, Officer Wolk testified that the marks shown in the photographs
were consistent with someone who had been choked and that the marks were also
consistent with force having been applied to both sides of her neck.  Officer
Wolk acknowledged on cross-examination, however, that Randle did not seek
medical attention for her injuries.

          The
testimony by Officer Wolk to which Appellant objected on Crawford gounds
is as follows:  Randle told Officer Wolk that she and her boyfriend Victor
Stovall had been dating for more than two years and that they had occasionally
lived together; Randle also told Officer Wolk that her boyfriend came home
intoxicated; that he was upset because she had not picked up some clothes on
the floor; and that he grabbed her from behind, choked her with his hands,
knocked her onto the ground, and placed his forearm on her throat as he
screamed at her.[5]

          Officer
Wolk testified that, after he spoke with Randle, he and another responding
officer attempted to locate Appellant.  They went to Appellant’s apartment and
knocked, but the door was locked.  No one answered when they knocked.  Officer
Wolk also testified, however, that he had personally confirmed that Appellant
lived in that apartment because he was involved in Appellant’s DWI arrest a
month later when Appellant had told him that he had lived in that apartment for
almost three years.

          Detective
Scott Austin investigated the November 2009 assault allegation against
Appellant and testified that he spoke with Appellant on the telephone about the
incident.  Appellant acknowledged that he became upset with Randle for leaving
clothing on the floor and said that he had told her to leave.  Appellant denied
telling Randle that he would kill her but admitted that he had pushed her out
of the apartment and that “his hand may have gone up to her throat” in the
process of pushing her out.  Appellant did not admit to Detective Austin that
he had choked Randle.

          The
State also offered other punishment-phase evidence that did not relate to the
extraneous offense.  Myra Rodrieguez, a Denton County probation officer
assigned to Appellant while he was out on bond, testified that the conditions
of Appellant’s bond included that he not consume any alcohol and that he have
an interlock device installed on any vehicle he drove.  Appellant would have to
blow into the interlock device before he could start the vehicle’s engine, and
the device would allow the engine to start only if it did not detect alcohol on
Appellant’s breath.  Rodrieguez testified that because Appellant told her that
his car had been impounded, she arranged for Appellant to instead have electronic
home-monitoring.

          Mark
Morgan is a field operation supervisor with an electronic monitoring company.  He
described the in-home device given to Appellant and testified that it works
like a vehicle interlock device and records whether Appellant had ingested
alcohol.  He testified that the device assigned to Appellant was calibrated and
tested and that it was working properly.  Morgan also testified that Appellant
was required to blow into the device twice each day, once between five and six
a.m. and once between six and eight p.m.

          Morgan
testified that the device was installed in Appellant’s apartment on May 14,
2010, and that the alcohol reading on Appellant’s first use of the device was
0.065.  Appellant was below the legal limit of intoxication but had consumed
alcohol in violation of his bond conditions.  The device also recorded that
Appellant had ingested alcohol on May 18, 19, 20, 28, and 31.  Morgan testified
that, because of the numerous bond violations, the in-home device was “locked
out” and eventually retrieved because it was not preventing Appellant from
ingesting alcohol.

          Investigator
Trent Brooks also testified and identified numerous exhibits relating to
Appellant’s criminal history.  Those exhibits reflect that, in addition to
Appellant’s two previous misdemeanor DWI convictions, Appellant has prior
convictions for another DWI occurring in 2001; robbery in 1991; reckless
driving in 1997;[6] and retaliation against a
prospective witness.  Also, Appellant’s probation for the robbery conviction
was revoked.  Investigator Brooks also identified a certification that
Appellant had missed a court date during the pendency of this case.

          Appellant
did not present witnesses during the punishment phase but offered a certified
copy of his Marine Corps record that was admitted by the trial court.

          During
closing arguments, the State specifically referred to the statements made by
Randle to Officer Wolk on only one occasion.  The State argued that Randle had
identified Appellant as Victor Stovall and had said that he choked her, but the
State did so only after first reciting what could be heard on the 911 tape and
then moved on to the injuries shown in the photographs that Officer Wolk had
taken of Randle after the incident.  The State’s other references to the
domestic assault are supported by the 911 call, Appellant’s statements to
Detective Austin after the incident, and Officer Wolk’s testimony that did not
relate to the statements made to him by Randle.

B. 
Improper Admission of Testimonial Statements

 

          The
Confrontation Clause of the Sixth Amendment guarantees that “[i]n all criminal
prosecutions, the accused shall enjoy the right . . . to be confronted with the
witnesses against him.”  U.S. Const. amend. VI.  In Crawford, 541 U.S. at
59,  124 S. Ct. at 1369, the Supreme Court held that the Confrontation Clause
of the Sixth Amendment bars the admission of testimonial statements of a
witness who does not appear at trial unless he is unavailable to testify and
the defendant had a prior opportunity to cross-examine him.  “Generally speaking,
a hearsay statement is ‘testimonial’ when the surrounding circumstances
objectively indicate that the primary purpose of the interview or interrogation
is to establish or prove past events potentially relevant to later criminal
prosecution.”  De La Paz v. State, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008)
(citing Davis v. Washington, 547 U.S. 813, 822–23, 126 S. Ct. 2266, 2273–74
(2006)).  “The primary focus in determining whether a hearsay statement is ‘testimonial’
is upon the objective purpose of the interview or interrogation, not upon the
declarant’s expectations.”  Id. (citing Davis, 547 U.S. at
822–23, 126 S. Ct. at 2273–74; Rangel v. State, 250 S.W.3d 96, 98 (Tex. Crim.
App. 2008) (per curiam) (Cochran, J., dissenting)).  Whether a statement is testimonial
is a question of law.  Id.

          Here,
the statements made by Randle to Officer Wolk were testimonial because the
primary purpose of Officer Wolk’s interrogation was to investigate Appellant’s
involvement in the assaultive offense.[7]  See Davis, 547 U.S.
at 827; 126 S. Ct. at 2276.  Once Appellant objected to that portion of Officer
Wolk’s testimony under Crawford, the State had the burden to establish
that Officer Wolk’s testimony was admissible under Crawford.  Because
the State did not attempt to do so, the trial court erred by admitting Officer
Wolk’s testimony concerning the information provided to him by Randle.  See
De La Paz, 273 S.W.3d at 681 (holding State failed to carry burden for
admission following Crawford objection).

C. 
Harm Standard

 

          This
court recently described the harm analysis applicable to the improper admission
of testimonial statements.  See Camp v. State, No. 02-10-00252-CR, 2011
WL 5515487, at *2 (Tex. App.—Fort Worth Nov. 10, 2011, pet. ref’d) (per curiam)
(mem. op., not designated for publication).  There, we stated as follows:

Crawford error is subject to
the harmless error standard of review, and we must reverse unless we determine
beyond a reasonable doubt that the error did not contribute to appellant[’]s
conviction or punishment.  Tex. R. App. P. 44.2(a); Langham v. State,
305 S.W.3d 568, 582 & n.42 (Tex. Crim. App. 2010).  In deciding whether the
error is harmless beyond a reasonable doubt, we must consider several Crawford-specific
factors: (1) the importance of the hearsay evidence to the State’s case, (2)
whether the hearsay evidence was cumulative of other evidence, (3) the presence
or absence of other evidence corroborating or contradicting the hearsay
evidence on material points, and (4) the overall strength of the State’s case.  Scott
v. State, 227 S.W.3d 670, 690–91 (Tex. Crim. App. 2007) (“With these
considerations in mind, the reviewing court must ask itself whether there is a
reasonable possibility that the Crawford error moved the jury from a
state of non-persuasion to one of persuasion on a particular issue.”).

 

We may also consider
other constitutional harm factors, if relevant, such as the nature of the
error, to what extent it was emphasized by the State, probable collateral
implications of the error, and the weight a juror would probably place on the
error. Snowden v. State, [353 S.W.3d 815, 822 (Tex. Crim. App. 2011)].  The
only requirement is that we must take into account every circumstance apparent
in the record that logically informs our constitutional error analysis.  Id.

 

Id. at *2 (footnote
omitted).

 

D. 
Harm Analysis

 

          We
must reverse unless we determine beyond a reasonable doubt after applying the
above-listed factors that the trial court’s error did not contribute to
Appellant’s punishment.  We first summarize the punishment-phase evidence
without reference to the improperly-admitted testimonial statements.  The State
presented evidence that a man named Victor argued with Randle in apartment 2204
of an apartment complex with an address that begins with 1679, that Randle
asked Victor to get off of her throughout the almost seventeen-minute 911 call,
that Victor threatened to hurt and kill Randle, that Victor lived in the
apartment, that the apartment was the same apartment Appellant was living in at
the time of his DWI arrest a month later, and that Appellant told Officer Wolk
at the time of his DWI arrest that he had lived in that apartment for almost
three years.  Appellant also admitted to Detective Austin that he had argued
with Randle in the apartment that day and that his hand may have gone up to her
throat when he pushed her out the door.  Moreover, the jury saw the photographs
depicting the injuries to Randle’s neck and throat.  While Officer Wolk’s
testimony about Randle’s hearsay statements to him were not entirely cumulative
of the other evidence of the assault in that Randle provided Officer Wolk with
more detail about how the assault had occurred, the jury could have determined
beyond a reasonable doubt from the admissible evidence that Appellant had
committed the assault.  See Tex. Code Crim. Proc. Ann. art.
37.07(3)(a)(1) (West Supp. 2012) (permitting State, during punishment, to offer
“evidence of an extraneous crime or bad act that is shown beyond a reasonable
doubt . . . to have been committed by the defendant”); see generally
Martinez v. State, 313 S.W.3d 358, 368 (Tex. App.—Houston [1st Dist.] 2009,
pet. ref’d) (holding charge error not harmful because evidence of extraneous
assault and other extraneous offenses offered during punishment was “clear,
strong, direct and unimpeached”).  The State’s case on punishment did not
therefore hinge on the improperly admitted testimonial statements, and we note
that the State made only one brief reference to the inadmissible evidence
during closing arguments.  While we cannot substitute our judgment for that of
the jury, the 911 recording (the admissibility of which is not at issue on
appeal) and the photographs of Randle’s injuries provided contemporaneous
evidence of the extraneous offense the State sought to prove.  From our review
of the 911 recording and the photographs, it is doubtful that the jury gave the
inadmissible hearsay any special weight considering the obvious markings on
Randle’s neck and throat as shown by the photographs and the emotional and
continual argument depicted on the 911 recording.  In other words, we do
not believe there is a reasonable possibility that the Crawford error
moved the jury from a state of nonpersuasion to one of persuasion concerning
the assault.  See generally Scott, 227 S.W.3d at 690–91.

          Beyond
the evidence of the extraneous offense, the State introduced other evidence
that Appellant, in addition to the two misdemeanor DWI convictions that
enhanced the present offense to felony DWI, had four other criminal
convictions, had served time in the penitentiary for some of those offenses,
and had his probation revoked; that Appellant continued to ingest alcohol in
violation of his bond conditions in this case; and that Appellant had missed a
court date in this case.  While the jury assessed Appellant’s punishment at
fifty years’ confinement,[8] we conclude beyond a
reasonable doubt that the trial court’s improper admission of the Crawford
hearsay evidence did not contribute to Appellant’s punishment.  See Tex.
R. App. P. 44.2(a); Langham, 305 S.W.3d at 582 & n.42.  We therefore
overrule Appellant’s third issue.

          We
also overrule Appellant’s fourth issue because, as we stated above, the State
presented evidence from which the jury could have determined beyond a reasonable
doubt that Appellant had committed the assault even without reference to the Crawford
evidence.  See Tex. Code Crim. Proc. Ann. art. 37.07(3)(a)(1).

IV.  Conclusion

 

          Having
overruled each of Appellant’s four issues, we affirm the trial court’s judgment.

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER
and MEIER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  September 13,
2012

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00174-CR

 

 









 
 
 Victor
 Stovall
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 362nd District
 Court
  
 of
 Denton County (F-2010-0776-D)
  
 September
 13, 2012
  
 Opinion
 by Justice Gardner
  
 (nfp)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed. 

 

SECOND DISTRICT COURT OF APPEALS 








 

 

 

 

By_________________________________

   
Justice Anne Gardner

 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Penal Code
Ann. §§ 49.04(a), .09(b)(2) (West Supp. 2012).





[3]Officer Clements testified
that he had planned to administer the HGN test before Appellant refused further
testing.





[4]As set forth above, Appellant’s
name is Victor Stovall.





[5]To the extent that other
statements by Randle to Officer Wolk could be considered testimonial under Crawford,
Appellant did not object to Officer Wolk’s testimony about those statements and
has thus not preserved error.  See Tex. R. App. P. 33.1(a).





[6]The reckless driving
conviction was a reduced charge pursuant to a guilty plea; the original charge
was DWI.





[7]By contrast, Randle’s
statements to the 911 dispatcher (which were recorded as part of the 911 call)
were not testimonial under Crawford because the purpose of those
questions was to learn of the “current circumstances requiring police assistance.” 
Davis, 547 U.S. at 827, 126 S. Ct. at 2276.





[8]The applicable punishment
range was “life, or for any term of not more than 99 years or less than 25
years.”  Tex. Penal Code Ann. § 12.42(d) (West Supp. 2012).