

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

### NO. 02-11-00174-CR

VICTOR STOVALL                                                                                            APPELLANT

V.

THE STATE OF TEXAS                                                                                                STATE

----------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant Victor Stovall appeals his conviction following a jury trial for felony driving while intoxicated (DWI).[2]  The jury heard evidence that officers responded to a citizen call at approximately 2:30 a.m. on December 25, 2009. Appellant's vehicle was stuck in the ice in an apartment complex parking lot.  He

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code Ann. §§ 49.04(a), .09(b)(2) (West Supp. 2012).

was revving the engine, spinning the tires, and disturbing others in the complex. An officer arrested Appellant for DWI after an investigation.

Appellant contends in his first two issues that the trial court erred by denying his motion to suppress because his initial detention was not supported by reasonable suspicion and because his arrest was not supported by probable cause. He argues in his third and fourth issues that the trial court abused its discretion by admitting punishment-phase evidence of an extraneous offense. Appellant does not challenge the sufficiency of the evidence. We affirm.

## II. Motion to Suppress

Appellant argues in his first and second issues that the trial court erred by denying his motion to suppress evidence because his initial detention was not supported by reasonable suspicion and because his arrest was not supported by probable cause. The State responds that the officer's initial contact with Appellant was a consensual encounter that did not require reasonable suspicion and that Appellant's arrest was supported by probable cause.

## A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact

2

questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

When, as here, the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

## B. Applicable Facts

At the pretrial suppression hearing, Lewisville Police Officer Jonathan Wolk testified that he was on patrol on December 25, 2009, when he received a dispatch at approximately 2:25 a.m. concerning a "traffic hazard." The caller reported that a person in the parking lot of the Autumn Breeze apartment complex was "revving his engine vehemently" and that the noise was keeping his children awake. Officer Wolk testified that it took him ten to fifteen minutes to respond because of icy conditions on the roadways.

3

When he arrived, Officer Wolk saw a Mercury Grand Marquis vehicle. He testified that it was "in the driveway running its engine, spinning its tires; and it appeared to be stuck on ice." Officer Wolk described his initial interaction with Appellant as follows:

> As I pulled in front of it, it continued to spin its tires, so I initiated my lights, hoping to get the driver to stop accelerating because by chance if it happened to grab traction, it might have went straight into me. I turned my lights on and pulled over to the side, just in case he didn't stop revving the engine, and I exited my vehicle.

Officer Wolk further testified that he stopped his vehicle beside Appellant's vehicle but that his patrol car was facing the opposite direction. Appellant stopped revving his engine when Officer Wolk exited his vehicle.

Officer Wolk approached the driver's side of Appellant's vehicle and made contact with Appellant. He testified that the window on Appellant's vehicle was down and that he began speaking with Appellant as he exited his patrol car. Officer Wolk further testified, "As I was walking up to the driver's seat, and he looked out at me, I noticed his eyes were droopy, almost half open. As I got closer, I noticed a portion that I could see was bloodshot and appeared to be glassy." Officer Wolk also testified that when he first started speaking with Appellant, he noticed that Appellant's speech was slurred and that his answers were "very delayed" rather than conversational. He also noticed "a moderate odor of alcohol coming from [Appellant's] breath."

4

Officer Wolk asked Appellant to exit the vehicle, and Appellant complied. Officer Wolk spoke with Appellant outside the vehicle, and Appellant said that he had consumed four beers. Appellant did not state when he had consumed the beers but told Officer Wolk that he drank the beers earlier at his apartment. Appellant also told Officer Wolk that he lived in one of the Autumn Breeze apartments.

Appellant informed Officer Wolk that he had taken two Darvocets that day for back pain. When Officer Wolk asked Appellant when he had taken the Darvocets, Appellant paused and then said, "I am high." Officer Wolk asked Appellant "what he was high on," and Appellant responded, "I'm sorry; I misspoke."

Officer Wolk testified that he talked with Appellant about why he was outside at 2:30 a.m. on Christmas, and Appellant said that he had purchased the vehicle thirty minutes earlier on the south side of the apartment complex and was trying to get it to his apartment on the north side of the complex. However, Officer Wolk testified that he had responded to an incident at Appellant's apartment about a month earlier and recalled that Appellant had the same vehicle at that time.

Officer Wolk testified that he called a DWI officer to investigate the possibility that Appellant was driving while intoxicated. Officer Wolk did not personally conduct any field sobriety tests, nor did he issue Appellant any traffic citations or place him under arrest.

Officer Christopher Clements testified that he responded to a radio call from Officer Wolk at approximately 2:45 a.m. on December 25, 2009. Officer Clements testified that Officer Wolk informed him of the reason for the initial dispatch and what he had observed of Appellant, including the moderate odor of alcohol on Appellant's breath and Appellant's slurred speech and red, glassy, and droopy eyes. Officer Clements testified that he made contact with Appellant "relatively quickly" and that he initially observed "[p]retty much the same thing[s] Officer Wolk saw." He also testified that Appellant gave very different answers to similar questions and that he had trouble hearing Appellant at times because of Appellant's slurred speech. Appellant also swayed while walking and standing.

Officer Clements testified that Appellant initially told him that he was just driving around the apartment complex but that Appellant later told him that he had started his car to warm it up before driving to work, saying that he had to be at work at 6:00 a.m. However, Appellant did not know the time when asked.

Officer Clements, rather than going through standard field sobriety tests because of the icy conditions, began alphabet and counting tests with Appellant. Appellant was initially uncooperative with Officer Clements's request that he recite the alphabet, saying, "If you're going to take me to jail, just take me to jail." Appellant did, however, begin reciting the alphabet, but he repeated the letter "E" twice and stopped at the letter "F" in order to point out another car that was stuck in the ice. Officer Clements testified that Appellant thereafter refused to perform

6

any other sobriety tests.[3]   At that point, Officer Clements arrested Appellant, handcuffed him, put him into the back seat of the police car, and read him his statutory warnings.   With Appellant in the back seat, Officer Clements ran Appellant's driver's license number and learned that Appellant had two previous DWI convictions.  Because of the prior convictions, Officer Clements testified that he drove Appellant to the hospital for a mandatory blood draw.

On cross-examination, Officer Clements denied that Appellant was under arrest by the time he arrived on scene and testified that if Appellant "had done perfectly" on all the field sobriety tests, he would have been released from detention.

## C.  Applicable Law

### 1.  Consensual Encounter

The Texas Court of Criminal Appeals has recognized three categories of interactions between police officers and citizens:   encounters, investigative detentions, and arrests.  *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002).  Unlike investigative detentions and arrests, which are seizures for Fourth Amendment purposes, an encounter is a consensual interaction that the citizen is free to terminate at any time.  *See Gurrola v. State*, 877 S.W.2d 300, 302–03 (Tex. Crim. App. 1994).  The dispositive question is whether the totality of the circumstances shows that the police conduct at issue would have caused a

---

[3]Officer Clements testified that he had planned to administer the HGN test before Appellant refused further testing.

reasonable person to believe that he was free to decline the officer's requests or otherwise terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 439–40, 111 S. Ct. 2382, 2389 (1991); *State v. Velasquez*, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999). If a reasonable person would feel free to terminate the encounter, the police-citizen contact is merely a consensual encounter and does not implicate the Fourth Amendment. *See United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002); *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S. Ct. 1319, 1324 (1983); *Velasquez*, 994 S.W.2d at 679.

Circumstances that may indicate that a police-citizen interaction is a seizure, rather than a consensual encounter, include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or use of language or tone of voice indicating that compliance with the officer's requests might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877 (1980). Absent some such evidence, however, otherwise inoffensive conduct between a citizen and a police officer cannot, as a matter of law, amount to a seizure of that person. *Id.* at 555, 100 S. Ct. at 1877.

### 2. Reasonable Suspicion

"No bright-line rule governs when a consensual encounter becomes a seizure." *State v. Woodard*, 341 S.W.3d 404, 411 (Tex. Crim. App. 2011). "Generally, however, when an officer through force or a showing of authority restrains a citizen's liberty, the encounter is no longer consensual." *Id.* "This is

the point at which an encounter becomes a detention or arrest, both of which are seizures under the Fourth Amendment." *Id.* "Thus, Fourth Amendment scrutiny becomes necessary." *Id.*

A temporary investigative detention is permissible provided the officer has a reasonable suspicion that the individual has engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968). Reasonable suspicion exists when an officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him reasonably to conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

### 3. Probable Cause

Under the Fourth Amendment, a warrantless arrest is unreasonable per se unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question and the arrest falls within one of the exceptions set out in the code of criminal procedure. *Torres*, 182 S.W.3d at 901; *see* Tex. Code Crim. Proc. Ann. arts. 14.01–.02 (West 2005), .03–.04 (West Supp. 2012).

Probable cause for a warrantless arrest requires that the officer have a reasonable belief that, based on facts and circumstances within the officer's

9

personal knowledge, or of which the officer has reasonably trustworthy information, an offense has been committed. *Torres*, 182 S.W.3d at 901–02. Probable cause must be based on specific, articulable facts rather than the officer's mere opinion. *Id.* at 902. We use the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Id.*

## D.  Reasonable Suspicion Supported Detention

Appellant argues that he was detained immediately upon Officer Wolk's arrival in the parking lot, and he points to Officer Wolk's use of his overhead lights and the positioning of Officer Wolk's patrol car to support his argument. An officer's use of the patrol car's emergency, flashing red and blue lights does not, however, automatically convert an encounter into a detention, particularly when the officer approaches a stationary vehicle. *Hudson v. State*, 247 S.W.3d 780, 785 (Tex. App.—Amarillo 2008, no pet.); *Franks v. State*, 241 S.W.3d 135, 142 (Tex. App.—Austin 2007, pet. ref'd); *Martin v. State*, 104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.); *see Randall v. State*, No. 10-11-00234-CR, 2012 WL 2053849, at *3 (Tex. App.—Waco June 6, 2012, pet. filed). Rather, the officer's use of the flashing lights is one fact to consider as part of the totality of the circumstances. *Randall*, 2012 WL 2053849, at *3–4; *see Franks*, 241 S.W.3d at 142. Thus, we consider whether the totality of the circumstances shows that Appellant's conduct at issue would have caused a reasonable person to believe that he was free to decline the officer's requests or otherwise terminate the encounter.

10

In that regard, Officer Wolk responded to a traffic hazard dispatch at approximately 2:30 a.m. on Christmas morning after a caller reported a disturbance caused by Appellant "revving his engine vehemently" in the apartment complex parking lot. Appellant's car appeared to be stuck on the ice, and Officer Wolk testified that he turned on his overhead lights for safety reasons so that Appellant's car would not lurch forward if it unexpectedly gained traction. Although Officer Wolk parked his car next to Appellant's vehicle, the record does not indicate that he parked the patrol car in a way that "boxed-in" Appellant's vehicle. Appellant's window was open when Officer Wolk arrived, and nothing in the record suggests that Officer Wolk gave Appellant any commands or made any other movements as a show of authority as he approached Appellant's vehicle.

The evidence presented at the suppression hearing in this case is quite similar to that presented in other cases in which our sister courts have concluded that the initial encounter was consensual and did not require reasonable suspicion. *See Franks*, 241 S.W.3d at 142; *see also Randall*, 2012 WL 2053849, at *4. In *Franks*, the officer had observed the defendant's vehicle parked in the same location at a rest area at different times over several days and decided to investigate. *See* 241 S.W.3d at 138–39. The officer parked his patrol car behind the defendant's car and activated his overhead lights. *Id.* at 139. He approached the defendant's car—the engine was running—and told the driver why he had stopped to investigate. *Id.* The driver appeared nervous and asked

11

if she could leave, but the officer told her that she could not leave. *Id.* The court held that the initial encounter with the driver was consensual and did not require any justification but that the consensual encounter escalated into a detention at the moment the officer informed her that she could not leave. *Id.* at 142.

In *Randall*, the officer observed a car parked on the side of the highway at night with its lights on. *See* 2012 WL 2053849, at *1. The officer pulled his patrol car behind the vehicle, turned on his overhead lights as well as his spotlight, and approached the defendant's vehicle. *Id.* The driver's window was rolled down, and the officer could hear the driver talking to his wife on the telephone. *Id.* The court held that the initial encounter between the officer and driver was an encounter rather than a detention. *Id.* at *5.

Here, Officer Wolk responded to a traffic hazard report, found Appellant's vehicle, turned on his overhead lights so that Appellant would stop revving the engine and spinning the tires on the ice, parked his patrol car beside Appellant's vehicle, and approached Appellant's vehicle. Officer Wolk did not order that Appellant roll down his window because the window was already rolled down. We hold that the record supports a determination that the initial interaction between Officer Wolk and Appellant was a consensual encounter. *See Randall*, 2012 WL 2053849, at *4–5; *Franks*, 241 S.W.3d at 142.

The encounter, however, escalated into a detention when Officer Wolk asked Appellant to exit the vehicle. *See Franks*, 241 S.W.3d at 142. Thus, Officer Wolk could not detain Appellant beyond the initial encounter without

12

reasonable suspicion. *See Woodard*, 341 S.W.3d at 411. An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford*, 158 S.W.3d at 492. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

The question, then, is whether Officer Wolk could have reasonably suspected that Appellant was, had been, or soon would be engaged in criminal activity at the time that he asked Appellant to exit the vehicle. The evidence reflects that Appellant was outside in the ice at 2:30 a.m. on Christmas morning, revving the engine on his vehicle, and spinning its tires in the ice. Officer Wolk testified that the window to Appellant's vehicle was down; that he began speaking with Appellant as he approached after parking his patrol car; that he noticed as he approached that Appellant's eyes were droopy, bloodshot, and glassy; that Appellant's speech was slurred and very delayed; and that he smelled a moderate odor of alcohol coming from Appellant's breath. We held last year in a similar case that an officer had reasonable suspicion to temporarily

13

detain a person beyond an initial consensual encounter, and we described the basis of our holding as follows:

> In the early morning hours following the July Fourth holiday, Officer Bain arrived at the scene to see a vehicle parked on the side of a busy roadway, with its lights on, its engine running, and Huddleston sleeping inside with two beer cans within reach. Immediately after waking Huddleston, Officer Bain noticed Huddleston's disorientation, his bloodshot and watery eyes, the odor of alcohol on his breath, and his instability when he exited the vehicle. Based on a totality of the circumstances, Officer Bain had sufficient articulable facts supporting a reasonable suspicion that Huddleston had been engaged in criminal activity. He was therefore justified in temporarily detaining Huddleston to conduct further investigation.

*Huddleston v. State*, No. 02-09-00406-CR, 2011 WL 3443597, at *4 (Tex. App.—Fort Worth Aug. 4, 2011, pet. ref'd) (mem. op., not designated for publication) (citations omitted). Here, Appellant was engaged in suspicious activity given the holiday, time of night, and icy conditions, and Officer Wolk noticed Appellant's slurred speech and droopy, bloodshot, and glassy eyes before he asked Appellant to exit his vehicle. We hold that Officer Wolk had sufficient articulable facts that would support a reasonable suspicion that Appellant had been engaged in criminal activity and that Officer Wolk was therefore justified in temporarily detaining Appellant for further investigation. The trial court did not err by denying Appellant's motion to suppress on this ground, and we overrule Appellant's first issue.

## E. Probable Cause Supported Arrest

Appellant argues in his second issue that his warrantless arrest was not supported by probable cause. This court held in *Hogan v. State*, 329 S.W.3d 90,

14

96 (Tex. App.—Fort Worth 2010, no pet.), that a strong odor of alcohol and Hogan's bloodshot, watery, and heavy eyes; swaying; unsteady balance; reckless driving; and refusal to provide a breath specimen were sufficient to establish probable cause for a DWI arrest. Here, Appellant was revving his vehicle's engine at 2:30 a.m. on Christmas morning in icy conditions with his window rolled down; had slurred speech and droopy, bloodshot, and glassy eyes; swayed when standing and walking; said he had drank four beers and had taken two Darvocets; told Officer Wolk that he was high but later said that he had misspoken; said that he had bought the car thirty minutes earlier; later said that he was driving around the parking lot; even later said that he was warming his car to go to work at 6:00 a.m. but did not know the time when asked; was generally uncooperative with Officer Clements; and refused further field sobriety tests after getting only to "F" of the alphabet test. These facts, all observed by the officers before Appellant's warrantless arrest, were sufficient to show probable cause that Appellant had committed DWI. *See id.*; *see also Dyar v. State*, 125 S.W.3d 460, 464 (Tex. Crim. App. 2003) (probable cause to arrest where driver admitted drinking and driving, and officer smelled alcohol and observed slurred speech, unintelligible answers, and red, glassy eyes); *Maxwell v. State*, 253 S.W.3d 309, 314 (Tex. App.—Fort Worth 2008, pet. ref'd) (citing refusal to perform field sobriety tests as factor that can support probable cause to arrest suspect for DWI). The trial court did not err by denying Appellant's motion

to suppress based on the alleged absence of probable cause to arrest, and we overrule Appellant's second issue.

### III. Admission of Evidence – Punishment Phase

Appellant argues in his third issue that the trial court erred by admitting testimonial evidence relating to an extraneous offense of assault in violation of the rule stated in *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004). He contends in his fourth issue that the remaining evidence of the extraneous offense, once the inadmissible testimonial evidence is excluded from analysis, was likewise inadmissible because it was insufficient to prove his commission of the extraneous offense beyond a reasonable doubt.

### A. Punishment-Phase Evidence

The State's first witness was Tasha Whitley, a dispatcher for the Lewisville Police Department who answers 911 calls and dispatches police, fire, and EMS personnel when necessary. Whitley testified that she answered a 911 call on November 15, 2009, and she described it as one of the worst she had ever had. She testified, "I've never, in the three and a half years I've worked, had what's called an open line where I just hear background noise for that long, with no one on the phone, and that I could hear the disturbance going on." Whitley also testified that the call was difficult for her because the male had said that he would kill the female.

The State offered, and the trial court admitted, the recording of the 911 call, and the State played the recording for the jury. Whitley then testified that

16

she could hear three voices on the recording: one male, one female, and one small child. She also testified that the female identified the male as Victor during the recording.[4] Near the end of the call, the female provided Whitley with an address, and Whitley dispatched police officers to the scene.

This court has listened to the sixteen-minute 911 recording that was played for the jury. The following can be heard on that recording:

- A male and female arguing;

- The female calls the male "Victor" several times;

- The female repeatedly says "get off of me" throughout much of the recording;

- The male says that he had let the female run her mouth at him for two years;

- The male says, "I'm gonna f--k you[r] head up, you hear me? Don't f--k with me";

- The male says, "I will hurt your mother f--king ass";

- The male says, "I will kill your bitch ass";

- The male tells the female to leave him alone, but the female responds that he is the one keeping her there;

- The female says to the dispatcher, Whitley, that the apartment address begins with 1679, that the apartment number is 2204, that the male is in the apartment, and that it is his apartment.

Officer Wolk was the State's next witness. He testified that he responded to the 911 dispatch on November 15, 2009, and that he was directed to the

---

[4]As set forth above, Appellant's name is Victor Stovall.

17

Autumn Breeze apartment complex where he met the female complainant, Monique Randle, at the apartment complex office. She identified herself as the 911 caller, and Officer Wolk discussed with her what had happened. Officer Wolk testified that Randle was crying and "sobbing fairly heavily," that she was struggling to breathe from crying, that he noticed red marks around her neck, and that she told him she was in pain. He described the marks as "going from about ear to ear around the front of her neck [with] scratch marks going down the side of her throat," and the trial court admitted photographs that Officer Wolk had taken to depict Randle's injuries.

Describing the photographs, Officer Wolk testified that the marks shown in the photographs were consistent with someone who had been choked and that the marks were also consistent with force having been applied to both sides of her neck. Officer Wolk acknowledged on cross-examination, however, that Randle did not seek medical attention for her injuries.

The testimony by Officer Wolk to which Appellant objected on *Crawford* gounds is as follows: Randle told Officer Wolk that she and her boyfriend Victor Stovall had been dating for more than two years and that they had occasionally lived together; Randle also told Officer Wolk that her boyfriend came home intoxicated; that he was upset because she had not picked up some clothes on the floor; and that he grabbed her from behind, choked her with his hands,

knocked her onto the ground, and placed his forearm on her throat as he screamed at her.[5]

Officer Wolk testified that, after he spoke with Randle, he and another responding officer attempted to locate Appellant. They went to Appellant's apartment and knocked, but the door was locked. No one answered when they knocked. Officer Wolk also testified, however, that he had personally confirmed that Appellant lived in that apartment because he was involved in Appellant's DWI arrest a month later when Appellant had told him that he had lived in that apartment for almost three years.

Detective Scott Austin investigated the November 2009 assault allegation against Appellant and testified that he spoke with Appellant on the telephone about the incident. Appellant acknowledged that he became upset with Randle for leaving clothing on the floor and said that he had told her to leave. Appellant denied telling Randle that he would kill her but admitted that he had pushed her out of the apartment and that "his hand may have gone up to her throat" in the process of pushing her out. Appellant did not admit to Detective Austin that he had choked Randle.

The State also offered other punishment-phase evidence that did not relate to the extraneous offense. Myra Rodrieguez, a Denton County probation officer

---

[5]To the extent that other statements by Randle to Officer Wolk could be considered testimonial under *Crawford*, Appellant did not object to Officer Wolk's testimony about those statements and has thus not preserved error. *See* Tex. R. App. P. 33.1(a).

19

assigned to Appellant while he was out on bond, testified that the conditions of Appellant's bond included that he not consume any alcohol and that he have an interlock device installed on any vehicle he drove. Appellant would have to blow into the interlock device before he could start the vehicle's engine, and the device would allow the engine to start only if it did not detect alcohol on Appellant's breath. Rodrieguez testified that because Appellant told her that his car had been impounded, she arranged for Appellant to instead have electronic home-monitoring.

Mark Morgan is a field operation supervisor with an electronic monitoring company. He described the in-home device given to Appellant and testified that it works like a vehicle interlock device and records whether Appellant had ingested alcohol. He testified that the device assigned to Appellant was calibrated and tested and that it was working properly. Morgan also testified that Appellant was required to blow into the device twice each day, once between five and six a.m. and once between six and eight p.m.

Morgan testified that the device was installed in Appellant's apartment on May 14, 2010, and that the alcohol reading on Appellant's first use of the device was 0.065. Appellant was below the legal limit of intoxication but had consumed alcohol in violation of his bond conditions. The device also recorded that Appellant had ingested alcohol on May 18, 19, 20, 28, and 31. Morgan testified that, because of the numerous bond violations, the in-home device was "locked

out" and eventually retrieved because it was not preventing Appellant from ingesting alcohol.

Investigator Trent Brooks also testified and identified numerous exhibits relating to Appellant's criminal history. Those exhibits reflect that, in addition to Appellant's two previous misdemeanor DWI convictions, Appellant has prior convictions for another DWI occurring in 2001; robbery in 1991; reckless driving in 1997;[6] and retaliation against a prospective witness. Also, Appellant's probation for the robbery conviction was revoked. Investigator Brooks also identified a certification that Appellant had missed a court date during the pendency of this case.

Appellant did not present witnesses during the punishment phase but offered a certified copy of his Marine Corps record that was admitted by the trial court.

During closing arguments, the State specifically referred to the statements made by Randle to Officer Wolk on only one occasion. The State argued that Randle had identified Appellant as Victor Stovall and had said that he choked her, but the State did so only after first reciting what could be heard on the 911 tape and then moved on to the injuries shown in the photographs that Officer Wolk had taken of Randle after the incident. The State's other references to the domestic assault are supported by the 911 call, Appellant's statements to

---

[6]The reckless driving conviction was a reduced charge pursuant to a guilty plea; the original charge was DWI.

Detective Austin after the incident, and Officer Wolk's testimony that did not relate to the statements made to him by Randle.

## B. Improper Admission of Testimonial Statements

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, 541 U.S. at 59, 124 S. Ct. at 1369, the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the admission of testimonial statements of a witness who does not appear at trial unless he is unavailable to testify and the defendant had a prior opportunity to cross-examine him. "Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) (citing *Davis v. Washington*, 547 U.S. 813, 822–23, 126 S. Ct. 2266, 2273–74 (2006)). "The primary focus in determining whether a hearsay statement is 'testimonial' is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations." *Id.* (citing *Davis*, 547 U.S. at 822–23, 126 S. Ct. at 2273–74; *Rangel v. State*, 250 S.W.3d 96, 98 (Tex. Crim. App. 2008) (per curiam) (Cochran, J., dissenting)). Whether a statement is testimonial is a question of law. *Id.*

Here, the statements made by Randle to Officer Wolk were testimonial because the primary purpose of Officer Wolk's interrogation was to investigate Appellant's involvement in the assaultive offense.[7] *See Davis*, 547 U.S. at 827; 126 S. Ct. at 2276. Once Appellant objected to that portion of Officer Wolk's testimony under *Crawford*, the State had the burden to establish that Officer Wolk's testimony was admissible under *Crawford*. Because the State did not attempt to do so, the trial court erred by admitting Officer Wolk's testimony concerning the information provided to him by Randle. *See De La Paz*, 273 S.W.3d at 681 (holding State failed to carry burden for admission following *Crawford* objection).

## C. Harm Standard

This court recently described the harm analysis applicable to the improper admission of testimonial statements. *See Camp v. State*, No. 02-10-00252-CR, 2011 WL 5515487, at *2 (Tex. App.—Fort Worth Nov. 10, 2011, pet. ref'd) (per curiam) (mem. op., not designated for publication). There, we stated as follows:

> *Crawford* error is subject to the harmless error standard of review, and we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant[']s conviction or punishment. Tex. R. App. P. 44.2(a); *Langham v. State*, 305 S.W.3d 568, 582 & n.42 (Tex. Crim. App. 2010). In deciding whether the error is harmless beyond a reasonable doubt, we must consider several *Crawford*-specific factors: (1) the importance of the hearsay

---

[7]By contrast, Randle's statements to the 911 dispatcher (which were recorded as part of the 911 call) were not testimonial under *Crawford* because the purpose of those questions was to learn of the "current circumstances requiring police assistance." *Davis*, 547 U.S. at 827, 126 S. Ct. at 2276.

23

evidence to the State's case, (2) whether the hearsay evidence was cumulative of other evidence, (3) the presence or absence of other evidence corroborating or contradicting the hearsay evidence on material points, and (4) the overall strength of the State's case. *Scott v. State*, 227 S.W.3d 670, 690–91 (Tex. Crim. App. 2007) ("With these considerations in mind, the reviewing court must ask itself whether there is a reasonable possibility that the *Crawford* error moved the jury from a state of non-persuasion to one of persuasion on a particular issue.").

We may also consider other constitutional harm factors, if relevant, such as the nature of the error, to what extent it was emphasized by the State, probable collateral implications of the error, and the weight a juror would probably place on the error. *Snowden v. State*, [353 S.W.3d 815, 822 (Tex. Crim. App. 2011)]. The only requirement is that we must take into account every circumstance apparent in the record that logically informs our constitutional error analysis. *Id.*

*Id.* at *2 (footnote omitted).

## D. Harm Analysis

We must reverse unless we determine beyond a reasonable doubt after applying the above-listed factors that the trial court's error did not contribute to Appellant's punishment. We first summarize the punishment-phase evidence without reference to the improperly-admitted testimonial statements. The State presented evidence that a man named Victor argued with Randle in apartment 2204 of an apartment complex with an address that begins with 1679, that Randle asked Victor to get off of her throughout the almost seventeen-minute 911 call, that Victor threatened to hurt and kill Randle, that Victor lived in the apartment, that the apartment was the same apartment Appellant was living in at the time of his DWI arrest a month later, and that Appellant told Officer Wolk at

24

the time of his DWI arrest that he had lived in that apartment for almost three years. Appellant also admitted to Detective Austin that he had argued with Randle in the apartment that day and that his hand may have gone up to her throat when he pushed her out the door. Moreover, the jury saw the photographs depicting the injuries to Randle's neck and throat. While Officer Wolk's testimony about Randle's hearsay statements to him were not entirely cumulative of the other evidence of the assault in that Randle provided Officer Wolk with more detail about how the assault had occurred, the jury could have determined beyond a reasonable doubt from the admissible evidence that Appellant had committed the assault. *See* Tex. Code Crim. Proc. Ann. art. 37.07(3)(a)(1) (West Supp. 2012) (permitting State, during punishment, to offer "evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt . . . to have been committed by the defendant"); *see generally Martinez v. State*, 313 S.W.3d 358, 368 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (holding charge error not harmful because evidence of extraneous assault and other extraneous offenses offered during punishment was "clear, strong, direct and unimpeached"). The State's case on punishment did not therefore hinge on the improperly admitted testimonial statements, and we note that the State made only one brief reference to the inadmissible evidence during closing arguments. While we cannot substitute our judgment for that of the jury, the 911 recording (the admissibility of which is not at issue on appeal) and the photographs of Randle's injuries provided contemporaneous evidence of the extraneous offense

25

the State sought to prove. From our review of the 911 recording and the photographs, it is doubtful that the jury gave the inadmissible hearsay any special weight considering the obvious markings on Randle's neck and throat as shown by the photographs and the emotional and continual argument depicted on the 911 recording. In other words, we do not believe there is a reasonable possibility that the *Crawford* error moved the jury from a state of nonpersuasion to one of persuasion concerning the assault. *See generally Scott*, 227 S.W.3d at 690–91.

Beyond the evidence of the extraneous offense, the State introduced other evidence that Appellant, in addition to the two misdemeanor DWI convictions that enhanced the present offense to felony DWI, had four other criminal convictions, had served time in the penitentiary for some of those offenses, and had his probation revoked; that Appellant continued to ingest alcohol in violation of his bond conditions in this case; and that Appellant had missed a court date in this case. While the jury assessed Appellant's punishment at fifty years' confinement,[8] we conclude beyond a reasonable doubt that the trial court's improper admission of the *Crawford* hearsay evidence did not contribute to Appellant's punishment. *See* Tex. R. App. P. 44.2(a); *Langham*, 305 S.W.3d at 582 & n.42. We therefore overrule Appellant's third issue.

---

[8]The applicable punishment range was "life, or for any term of not more than 99 years or less than 25 years." Tex. Penal Code Ann. § 12.42(d) (West Supp. 2012).

We also overrule Appellant's fourth issue because, as we stated above, the State presented evidence from which the jury could have determined beyond a reasonable doubt that Appellant had committed the assault even without reference to the *Crawford* evidence. *See* Tex. Code Crim. Proc. Ann. art. 37.07(3)(a)(1).

## IV. Conclusion

Having overruled each of Appellant's four issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 13, 2012