# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00231-CR

**Pamela Rose Franks, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-05204815, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

Appellant Pamela Rose Franks was convicted after pleading guilty to possession of less than one gram of cocaine. *See* Tex. Health & Safety Code Ann. § 481.102(3)(D) (West Supp. 2006), § .115(a), (b) (West 2003). In her sole point of error, appellant contends that the trial court erred in denying her motion to suppress evidence "because the seizure and search was unreasonable and did not fall within the community-caretaking exception of the warrant requirement of the Fourth Amendment of the United States Constitution or Article I, section 9 of the Texas Constitution." *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9; *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *Wright v. State*, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999). Based on this record, we conclude that appellant's detention was not justified by the officer's reasonable suspicion of appellant's involvement in criminal activity or the officer's exercise of his community-caretaking function. We reverse the judgment and remand this case to the district court.

BACKGROUND

The only witness who testified at the February 16, 2006 suppression hearing was Austin Police Department Officer Zachary LaHood. He stated that while responding to a daytime call about a collision, he drove near the "Y" in Oak Hill—where Highways 290 and 71 intersect—and noticed a black Toyota Camry sedan parked just off the highway at a rest area with a picnic table. In the evening, he passed through that part of Austin again and observed the "same vehicle parked there." He found that odd, but he was busy and "didn't have time to check it out." The next day, en route to another collision, he saw the "same vehicle parked in the same spot," which raised his suspicion that the car might have been abandoned, stolen, or broken down. He did not note the license-plate number of the car that he had seen while driving by the rest area, but he planned to return later in the day and look into the situation if the car remained there.

After dark that evening, Officer LaHood observed the "same vehicle" at the rest area. The rest area did not have any lighting, and except for one car, it was unoccupied. LaHood decided to conduct a "check welfare" stop. As he parked his patrol car behind the car at the rest area, LaHood noticed that the dome light that had been activated in the parked car was turned off. "As soon as" he saw the dome light go out, he activated the overhead lights on his patrol car "to conduct a stop." When the lights were on, he saw that there was a person inside the parked car.

LaHood approached the car (which had its engine running), introduced himself to the driver, appellant, and explained that he was talking to her because he had observed her car at the rest area four times in the last twenty-four hours—during the day and at night. Appellant was "visibly upset"—she was crying, her breathing was "fast" and "shallow," and she "appeared to be very

2

anxious" and "nervous." At the outset, as appellant was crying and upset, she asked the officer "several times [, C]an I just go, can I just go[?]" He testified that he replied, "[N]o, you can't go. You are upset. I want to find out why you are upset, what [is] wrong." LaHood testified that from the moment of his first contact with appellant at the car door, "it became more and more apparent that she was becoming more anxious and agitated." Appellant informed him that she was having marital problems. Because of this information and her upset condition, LaHood thought that she might have been assaulted by her husband. While he was talking to her, LaHood saw some unspecified "objects" in the back seat and floorboard of her car. He then asked appellant for her driver's license. She stated that she had an identification card, but she did not have a driver's license. He asked appellant whether she was alone, and becoming more upset, she admitted that no one else was with her.

Not wanting her to drive away without a driver's license, LaHood asked appellant to step out of her car, and she complied. Then while speaking with the officer, appellant had a "wardrobe malfunction" and exposed one of her breasts. LaHood told her to correct it. Officer Seago, a female officer seated in the patrol car, witnessed the incident and walked over toward LaHood and appellant.

As appellant and Seago conversed at the rear of appellant's car, LaHood began shining his flashlight on the back seat and driver's seat of the car. Seeing this, appellant "bee-lined" toward the car, placing herself between LaHood and the driver's side door. He asked her to return to the back of the car, and she initially did so, but when the officer continued shining his flashlight

3

inside her car, she again positioned herself in front of the driver's side door, becoming more anxious. LaHood asked her again to stand back with the other officer.

When LaHood looked inside appellant's car this time, he saw several uninflated balloons, empty soda cans, wadded up paper towels, and packages of flavored sexual lubricant on the car's rear floorboard. He knew that balloons were commonly used to transport heroin and that soda can bottoms were used as dishes in which to cook narcotics. Based on the lubricant and paper towels, he thought that it was possible that appellant was "running prostitution activities out of the vehicle." On the driver's side floorboard he saw an empty balloon and what he believed was a "push rod." A push rod, he explained, is a metal rod used to shove narcotics inside a pipe or to scrape it down after its use.

LaHood apparently halted his viewing of the car when appellant claimed to have been prescribed medication for suicidal thoughts and stated that she was not taking her medication. Her disclosure triggered the police policy requiring the officers to immediately summon a suicide-intervention officer to the scene. After interviewing appellant, the responding intervention officer, Torres, determined that appellant did not require commitment.

At the completion of Torres's interview, LaHood planned to release appellant and issue a "field observation card" to her, but she could not drive from the scene because Department of Public Safety records confirmed that her driver's license had been suspended. Appellant placed a telephone call to her husband to get a ride and arrange to remove her car from the rest area. LaHood testified that to prevent appellant from hurting herself or the officers, he wanted to confirm that her car did not contain any weapons before allowing her to return to it. He thought that firearms

4

or other weapons might have been in the car for two reasons: first, because appellant had already admitted to having suicidal thoughts; and second, because he had personally encountered loaded weapons in vehicles during prostitution stings, and he thought appellant's car could have been used for prostitution activity. He proceeded to "frisk" the car for weapons. The "frisk," he explained, was distinct from a search because he did not "go into any containers or anything like that"; he was only "looking for a spot where a weapon could be placed," such as under the seat or floor mat.

During this "frisk," LaHood looked at the front passenger seat and saw appellant's large, unzipped purse, which he thought would easily conceal a handgun. Illuminated by his flashlight and on top of the purse was a pipe, commonly used to smoke marijuana, with marijuana residue on it. At that point, he determined that appellant would be arrested for possession of drug paraphernalia. Further search of appellant's car after her arrest revealed a case in the pocket of the driver's side door containing .7 grams of crack cocaine.

Appellant was subsequently indicted for possession of cocaine and filed a motion to suppress evidence. After the district court denied the motion, appellant pleaded guilty. This appeal followed.

**DISCUSSION**

In her sole point of error, appellant contends that the court erred in denying her motion to suppress evidence "because the seizure and search was unreasonable and did not fall within the community-caretaking exception of the warrant requirement of the Fourth Amendment of the United States Constitution or Article I, section 9 of the Texas Constitution." *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9; *Cady*, 413 U.S. at 441; *Wright*, 7 S.W.3d at 151. The State

5

contends that LaHood's initial contact with appellant was not a detention but an encounter, that LaHood's brief detention of appellant was justified by reasonable suspicion, and alternatively, that the detention was justified by LaHood's exercise of his community-caretaking function.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts and reviewing the court's application of search and seizure law de novo. *See Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). When, as here, the trial court does not enter findings of fact, we "view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *Id.* at 25 (quoting *Ross v. State*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000)). If the ruling on the motion to suppress is reasonably supported by the record and is correct under any theory of law applicable to the case, we must uphold the ruling. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002) (citing *Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990)).

**Detentions and encounters**

Both the Fourth Amendment and article I, section 9 of the Texas Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9. Because appellant has not argued that article I, section 9 affords her with protection that is distinct from that of the Fourth Amendment, we treat them as providing the same protection and consider them jointly. *See Johnson v. State*, 912 S.W.2d 227, 233-34 (Tex. Crim. App. 1995) ("[F]ramers of the Texas Constitution chose to draft Art. I, § 9 to protect Texas citizens from

6

unreasonable searches and seizures by the state in the same way they were protected from unreasonable searches and seizures by the federal government.").

Appellant argues that she was illegally seized by LaHood because she was detained without a reasonable suspicion of involvement in criminal activity. A police officer may stop and briefly detain a person for investigative purposes if, under the totality of the circumstances, the officer has reasonable suspicion supported by articulable facts that the person detained is, has been, or soon will be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). An investigative detention occurs when an individual is confronted by a police officer, yields to the officer's display of authority, and is temporarily detained for purposes of an investigation. *Johnson*, 912 S.W.2d at 235. Whether reasonable suspicion exists is determined by considering the facts known to officer at the time of the detention. *See Terry*, 392 U.S. at 21-22 (stating that seizure's reasonableness is based on "facts available to the officer at the moment of the seizure"); *see also Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997); *Tanner v. State*, No. 03-06-00217-CR, 2007 Tex. App. LEXIS 4864, at *10 (Tex. App.—Austin June 20, 2007, no pet.).

Detentions are distinct from encounters. Encounters are consensual interactions between citizens and police that do not require reasonable suspicion and do not implicate constitutional rights. *See Florida v. Royer*, 460 U.S. 491, 497-98 (1983). Encounters occur when police officers approach an individual in a public place to ask questions, request identification, or request consent to search as long as the interaction is consensual—that is, as long as an officer does not convey a message that compliance with the officer's request is required. *Florida v. Bostick*,

7

501 U.S. 429, 434-35 (1991) (holding that encounters are consensual if "reasonable person would feel free 'to disregard the police and go about his business'" (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991))); *see also Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997) (holding that citizen's encounter with officer was consensual because a reasonable person would have felt free to walk away).

**Appellant's interaction with LaHood**

In support of her argument that she was illegally seized, appellant states that LaHood decided to stop her and detained her by parking his patrol car behind her car at the rest area, activating the overhead lights on his car, and refusing her request to leave. Based on the chronology of events presented in this record, we conclude that the interaction between LaHood and appellant was an encounter that progressed to an investigative detention when her request to leave was refused.

Appellant's car was parked at the rest area when LaHood first approached it. Because LaHood thought that he had observed "the same vehicle parked in the same spot" at random hours of the day and night, he believed that it might have been abandoned, stolen, or broken down. His initial investigation of the car's status did not require any justification.

The initial interaction between LaHood and appellant, after he approached the car, was an encounter. Although LaHood parked his vehicle behind appellant's, nothing in the record suggests that the position of his vehicle blocked hers or prevented appellant from leaving the rest area by simply driving forward. Moreover, appellant does not allege that the patrol car's siren was activated, that she received any command over the patrol car's loudspeaker, or that LaHood told her to turn off her car's engine when he approached.

8

Appellant's argument that she was detained based on LaHood's activation of the overhead lights on the patrol car is not determinative. LaHood testified that he activated the overhead lights on his patrol car to illuminate the rest area, which did not have any lighting. Use of the patrol car's overhead lights in an area that appeared dark and unoccupied except for a single car does not necessarily constitute a detention. *See Martin v. State*, 104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.) (concluding that officer's use of overhead lights did not necessarily cause encounter to become stop).

However, the initial encounter between LaHood and appellant progressed to an investigative detention when LaHood refused appellant's request to leave. Before LaHood told appellant, "[N]o, you can't go," he knew only that she was crying and that she was seated in a car that he thought he had seen several times at the rest area. He did not testify about specific facts leading him to suspect that appellant was, had been, or soon would be engaged in criminal activity. Although LaHood wondered whether the car might have been stolen, he never questioned appellant about the car's ownership, and he did not state that appellant was detained because he suspected that she was a car thief. Instead, he told her that she could not leave and that he wanted to find out why she was upset.

The State notes that "at some point," appellant informed LaHood that her driver's license had been suspended and that appellant's failure to produce a driver's license would have given the officer reasonable cause to detain her, as well as probable cause for her arrest. *See* Tex. Transp. Code Ann. §§ 521.021 (prohibiting operation of motor vehicle on highway without driver's license), .461 (West 2007) (punishable as misdemeanor offense). But the record reflects

9

that LaHood did not inquire about appellant's driver's license until after he had refused her request to "just go."

Relying on *Carey v. State*, 855 S.W.2d 85, 87 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd), the State argues that despite appellant's request to leave, LaHood was permitted to "ask her to wait for him to check her identification" because a police officer may briefly stop a suspicious individual to determine the individual's identity or to maintain the individual's status quo while obtaining more information. The State also argues that LaHood had reason to view appellant as a "suspicious individual" and asserts that the demeanor of the suspect in *Carey* and that of appellant in this case are comparable. We disagree.

In *Carey*, the suspect's detention was supported by the officer's reasonable suspicion, stemming from his knowledge of specific facts: (1) he knew that the apartment complex was located in a high-crime area; (2) he knew that the area was well known for drug trafficking; (3) he was informed by the manager of an apartment complex about two strangers who were in an unfamiliar car in the apartment's parking lot that night; and (4) he located the suspect inside a car in the parking lot of the apartment complex. *Id*. at 86-87. There was also testimony that during the officer's questioning, the suspect became "very nervous, began sweating, began looking around in several directions and evaded the officer's questions." *Id*. at 86.

Here, unlike the officer in *Carey*, LaHood was not acting on a reliable tip about a suspicious person, nor was there any testimony characterizing the rest area as a high-crime area or a scene of known drug trafficking. Appellant's nervousness and crying do not rise to the same level of anxiety demonstrated by the suspect in *Carey*. In any event, the court in *Carey* did not justify the

10

suspect's detention based solely on his unusual behavior but in the context of all the information that the officer had at the time of the stop. We further note that, contrary to the State's suggestion, this record does not reflect that LaHood "asked appellant to wait." He told her at the outset, "[N]o, you can't go." It was not an inquiry.

Considering the totality of these circumstances in the light most favorable to the trial court's ruling, we conclude that LaHood's initial interaction with appellant was an encounter but his subsequent statement to appellant, "[N]o, you can't go," conveyed a message that she was not free to leave and constituted a detention. *See Hunter*, 955 S.W.2d at 104. We further conclude, based on this record, that when LaHood refused to allow appellant to leave, he did not have reasonable suspicion to detain her. Accordingly, we must consider whether LaHood's detention of appellant was justified by the Fourth Amendment's community-caretaking exception.

**Community caretaking**

Appellant contends that she was illegally seized when LaHood declined her request to leave and that her detention was not justified by LaHood's community-caretaking function. We agree. Under the community-caretaking exception to the Fourth Amendment, and as part of their duty to "serve and protect," police officers "may stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help." *Wright*, 7 S.W.3d at 151. A community-caretaking stop does not require the officer to have reasonable suspicion or probable cause to believe that an offense has been committed. *See Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002). The exception stems from the recognition that a police officer's duties involve activities other than gathering evidence, enforcing the law, and conducting

11

investigations. *See Cady*, 413 U.S. at 441; *Wright*, 7 S.W.3d at 151. Because the community-caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady*, 413 U.S. at 441, a police officer may not properly invoke his community-caretaking function if he is primarily motivated by a non-community-caretaking purpose. *Corbin*, 85 S.W.3d at 277. While recognizing the existence of the community-caretaking exception, the Texas Court of Criminal Appeals has emphasized "its narrow applicability." *Wright*, 7 S.W.3d at 152.

Assessing the applicability of the community-caretaking exception requires a dual inquiry: first, whether the police officer was primarily motivated by a community-caretaking purpose; and second, whether the officer's belief that the individual needed help was reasonable. *See Corbin*, 85 S.W.3d at 277. In this case, the trial court heard testimony that appellant's car had been observed four times, day and night, parked in the same spot at a rest area, leading LaHood to suspect that the car might have been broken down or abandoned. The court also heard testimony that when LaHood saw appellant, she was crying, "really upset," and informed him that she was having marital problems. LaHood also testified that appellant became increasingly "anxious and agitated," and he denied that there was any point at which appellant calmed down or that he ceased being concerned about her agitation. Her behavior suggested that she might have been assaulted, and LaHood wanted to find out what was wrong. As the fact finder and the exclusive judge of credibility, the court could have determined that when LaHood refused to allow appellant to leave the scene, he was primarily motivated by a community-caretaking purpose. *See id.*

12

Next, we must decide whether the officer's belief that appellant needed help was reasonable. *See id.* (citing *Wright*, 7 S.W.3d at 151-52). To evaluate the reasonableness of the officer's belief, we consider four non-exclusive factors: (1) the nature and level of the distress exhibited by the individual; (2) the location of the individual; (3) whether the individual was alone and/or had access to assistance other than that offered by the officer; and (4) to what extent the individual, if not assisted, presented a danger to himself or others. *Id*. (citing *Wright*, 7 S.W.3d at 152). The first factor, although not always dispositive, is entitled to the greatest weight: "the greater the nature and level of distress exhibited, the more likely police involvement will be a reasonable exercise of the community caretaking function." *Id*. The remaining factors "give more definition to the first factor" because, based on their presence or absence, "a particular level of exhibited distress may be seen as more or less serious." *Id*.

The first factor, the level of the individual's exhibited distress, weighs against appellant's detention. According to the record, appellant was crying, nervous, and breathing rapidly and reported having marital problems. On cross-examination, LaHood recalled that appellant had "tears from her eyes" and "sniffles" and appeared "emotionally upset about something." LaHood speculated that she might have been assaulted, but he did not ask her about it. Nor is there any evidence in the record demonstrating that appellant had bruises, scratches, or other signs of physical abuse. At the time he detained appellant, the only evident distress was her "emotionally upset" condition. We conclude, on this record, that appellant did not exhibit a level of distress justifying LaHood's belief that she needed assistance.

13

The second factor, the individual's location, also weighs against appellant's detention. The record shows that LaHood discovered appellant at a rest area that was near the intersection of two highways. LaHood passed this location multiple times while he was en route to investigate accidents. The record does not show that this location was unsafe or isolated from traffic, businesses, and residences. *See Corbin*, 85 S.W.3d at 278.

The third factor, whether the individual was alone or had access to assistance, supports appellant's detention. Appellant admitted that she was alone. Her access to other assistance is questionable: she was discovered at an unoccupied and unlit rest area after dark in a car that appeared to have been immobile for the preceding twenty-four hours at a location that lacked sidewalks. Although she placed a telephone call from the scene—and LaHood testified that he "had her on the phone" with her husband because she could not drive away from the scene—it is unclear whose telephone she used. The record does not clearly demonstrate that appellant had access to assistance besides LaHood.

The fourth factor, the extent to which the individual posed a danger to herself or others if not assisted, weighs against appellant's detention. The record shows that at the time LaHood detained appellant, he knew the following facts: appellant was crying and she was seated in a car that LaHood thought he had seen previously parked at the rest area. Nothing in this record shows that appellant posed a danger to herself or others during the time that she had been at the rest area, or that she would have become a danger if LaHood had allowed her to leave the rest area when she asked to go. Based on the facts in this record, we conclude that appellant's detention was not objectively reasonable and therefore was not justified by LaHood's community-caretaking function.

14

Even when viewed in the light most favorable to the trial court's ruling, the evidence in the record fails to show that appellant's detention was justified by LaHood's reasonable suspicion or the exercise of his community-caretaking function. Because the trial court's ruling is not reasonably supported by the record and is incorrect under both legal theories urged by the State, and because the State failed to carry its burden, we conclude that the court erred in denying appellant's motion to suppress. We sustain appellant's sole point of error.

## CONCLUSION

Having sustained appellant's sole point of error, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion.

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Reversed and Remanded

Filed:   September 18, 2007

Publish

15