# NO. 12-12-00140-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DUDLEY KRISSHAWN HICKMAN,* *APPELLANT* | § | *APPEAL FROM THE 241ST* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Dudley Krisshawn Hickman appeals his conviction for felony driving while intoxicated (DWI). In his sole issue on appeal, he argues that the trial court erred in denying his motion to suppress evidence. We affirm.

## BACKGROUND

In the late evening on June 24, 2011, or the early morning hours on June 25, 2011,[1] Deputy Sherman Dollison was patrolling a rural area of Smith County, Texas, looking for a black sports car used in connection with copper thefts from local churches in the area. While heading northbound on County Road 210, he observed a black sports car traveling southbound. Deputy Dollison made a U-turn in order to obtain a better view of the car to determine if it was the car used in the copper thefts. Deputy Dollison had to quickly accelerate in order to catch the vehicle. As

---

[1] The video camera in the patrol unit showed that it was approximately 11:00 p.m. on June 24, 2011. The deputy stated in his report and at the hearing that he thought it was midnight. There was a question as to whether the video camera had been updated to reflect daylight savings time. Finally, the trial court stated in its findings of fact and conclusions of law that the interaction began at approximately 1:00 a.m. on June 25, 2011. This finding appears to be unsupported by the record, although the exact time is not material to the outcome of this case.

he approached, the car pulled into a very dark lot in a wooded rural area on which was located an obviously dilapidated and abandoned house. The deputy knew that the house was abandoned because he regularly passed it on his patrol route.

As Deputy Dollison pulled in behind the car, an individual later determined to be Appellant exited the car and walked in front of it. Based on his experience, Deputy Dollison suspected that Appellant threw something on the ground, although he did not specifically see it. As Appellant made his way to the front of the car, Deputy Dollison determined that this was not the vehicle involved in the copper thefts. However, due to the suspicious circumstances, the deputy asked Appellant to come towards the patrol unit. As Appellant made his way to the patrol unit, he walked from the front of his vehicle around the passenger side, and back towards the patrol unit parked behind Appellant's car. At that point, Deputy Dollison activated his emergency lights, which activated the patrol unit's video camera.

For his safety, Deputy Dollison asked Appellant to wait in front of his patrol unit. When the deputy approached Appellant and talked to him, he immediately detected the odor of alcohol on his breath, and observed that Appellant had bloodshot eyes and slurred speech. The deputy asked Appellant what he was doing at the abandoned house, and Appellant stated that he was looking for a friend's home. When asked why he pulled into this particular lot, turned his lights off, and exited the car, Appellant admitted that he did so because he saw Deputy Dollison make the U-turn and knew that he was a police officer. Deputy Dollison asked whether Appellant had been drinking, and Appellant replied that he had a couple of beers.

The deputy also asked Appellant whether he had thrown anything on the ground as he walked towards the front of his car. Appellant replied that he had not. After backup arrived, Deputy Dollison searched the area on the ground in front of Appellant's car, found the keys, and then asked Appellant why he threw them on the ground. Appellant replied that he was the passenger and a friend was the driver, but that his friend fled into the dense woods behind the house due to a warrant for him because of child support arrearages. However, Deputy Dollison saw Appellant exit the driver's side of the vehicle as he drove up and did not see any other individuals exit the vehicle. Also, a registration check showed that the car belonged to Appellant.

The deputy then sought and obtained Appellant's consent to search the vehicle. He observed a partial case of beer containing five unopened beers located behind the driver's seat.

2

Deputy Dollison called for a Department of Public Safety trooper to perform field sobriety tests on Appellant. Trooper Ryan Thompson performed the field sobriety tests.[2] Based on Appellant's performance, the trooper believed he was intoxicated. Accordingly, Appellant was arrested for DWI. Appellant refused to provide a breath specimen, so a specimen of his blood was taken. The blood test results showed that Appellant had a blood alcohol level of 0.12 grams of alcohol per 100 milliliters of blood. Appellant was subsequently indicted, and due to enhancements, for prior DWIs and intoxication assault, Appellant's sentencing range was enhanced to that of a first degree felony.

Appellant filed a motion to suppress evidence. After a hearing, the trial court denied Appellant's motion and issued findings of fact and conclusions of law. A trial was held, and the jury found Appellant guilty. Appellant pleaded "true" to the enhancements, and after a sentencing hearing, the jury assessed a sentence of imprisonment for life. This appeal followed.

## MOTION TO SUPPRESS

In his sole issue, Appellant argues that the trial court erred in denying his motion to suppress because Deputy Dollison detained him, but did not have reasonable suspicion to support the detention after he determined that Appellant's vehicle was not the one used in the copper thefts.

### Standard of Review

A bifurcated standard of review is applied to a trial court's ruling on a motion to suppress evidence. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). This standard requires an appellate court to give almost total deference to a trial court's determination of historical facts and applies a de novo review of a trial court's application of the law to those facts. *See id.* A trial court is the sole trier of fact, the judge of witness credibility, and the weight to be given to witnesses' testimony. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).

When the trial court makes explicit findings of fact, an appellate court determines whether

---

[2] When Trooper Thompson asked Appellant whose home he was looking for, he gave a name that was different from the name he provided to Deputy Dollison. He also told Trooper Thompson that the friend he was going to visit lived in Overton, Texas, but he told Deputy Dollison that his friend lived on the road where he was stopped. Overton was not in the vicinity of the road where he was detained. Finally, he told the trooper that he consumed approximately four beers earlier in the evening.

the evidence, viewed in the light most favorable to the ruling, supports those findings. ***State v. Kelly***, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). Then, the appellate court reviews the trial court's legal conclusions de novo and upholds the ruling so long as it is supported by the record and correct under any legal theory applicable to the case. ***State v. Iduarte***, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008); ***Banda v. State***, 317 S.W.3d 903, 907–08 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

**Applicable Law**

There are three different types of interactions between citizens and law enforcement officers: (1) consensual encounters; (2) investigatory detentions; and (3) arrests. ***State v. Woodard***, 341 S.W.3d 404, 410–11 (Tex. Crim. App. 2011). Consensual encounters do not implicate Fourth Amendment protections. *Id.* at 411. Police officers are free to request information from a citizen with no justification in a consensual encounter. *Id.* A citizen may terminate such a consensual encounter at will. *Id.* A citizen's acquiescence to an officer's request does not automatically transform a consensual encounter into a detention or seizure, even if the officer does not communicate to the citizen that the request for information may be ignored. *Id.*

To justify an investigative detention, however, an officer "must have reasonable suspicion founded on specific, articulable facts which, when combined with rational inferences from those facts, would lead the officer to conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." ***Crain v. State***, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010). Trial and appellate courts must view "the totality of the circumstances" of the contact in the light most favorable to the trial judge's factual findings. ***State v. Garcia–Cantu***, 253 S.W.3d 236, 244 (Tex. Crim. App. 2008). The question of when contact between police officers and a person in a car constitutes a detention depends on specific facts as to the manner of the contact, the degree of authority displayed, and all other circumstances surrounding the incident. *Id.* A reviewing court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter. *Id.* at 242. "Each citizen-police encounter must be factually evaluated on its own terms; there are no per se rules." *Id.* at 243. Circumstances that seem innocent when considered in isolation may combine to reasonably

suggest the imminence of criminal conduct may justify an investigative detention. ***Derichsweiler v. State***, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). The relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular noncriminal acts. ***Id***.

Examples of circumstances that might indicate a detention has occurred would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. ***Crain***, 315 S.W.3d 43, 49–50 (Tex. Crim. App. 2010). The activation of emergency lights and the positioning of the patrol unit are also circumstances that could indicate a detention. *See* ***Garcia–Cantu***, 253 S.W.3d at 243. An officer's use of the patrol car's emergency lights does not, however, automatically convert an encounter into a detention, particularly when the officer approaches a stationary vehicle. *See* ***Hudson v. State***, 247 S.W.3d 780, 785 (Tex. App.—Amarillo 2008, no pet.); ***Franks v. State***, 241 S.W.3d 135, 142 (Tex. App.—Austin 2007, pet. ref'd); ***Martin v. State***, 104 S.W.3d 298, 301 (Tex. App.—El Paso 2003, no pet.); *see* ***Randall v. State***, No. 10–11–00234–CR, 2012 WL 2053849, at *3 (Tex. App.—Waco June 6, 2012, pet. ref'd) (mem. op., not designated for publication). Rather, the officer's use of the flashing lights is one fact to consider as part of the totality of the circumstances. ***Randall***, 2012 WL 2053849, at *3–4; *see* ***Franks***, 241 S.W.3d at 142. Nor does the positioning of the officer's patrol vehicle automatically determine whether a seizure occurred. ***Garcia–Cantu***, 253 S.W.3d at 243 (noting that "boxing the car in . . . will likely convert the event into a Fourth Amendment seizure[,]" implicitly meaning that patrol unit's position does not necessarily create detention under all circumstances). It is likewise another factor in the analysis. *See* ***id***.

## Discussion

Appellant argues that Deputy Dollison's interaction with him was a detention unsupported by reasonable suspicion. The trial court's findings of fact and conclusions of law do not address whether the initial interaction was merely a citizen encounter or a temporary detention. Rather, the trial court appears to assume that a detention took place, but does not specifically address when the detention began.

Appellant argues that he was detained because Deputy Dollison positioned his patrol unit

5

in such a way as to block Appellant's means of egress, the deputy activated his emergency lights, and he made statements to Appellant indicating he was not free to leave. First, Appellant did not argue at the hearing that the positioning of the patrol unit constricted his egress from the property, and the trial court did not discuss the positioning of the vehicles in its findings of fact. Moreover, the video is inconclusive, and as we have stated, the "boxing in" of a vehicle is not necessarily determinative by itself. *See Garcia–Cantu*, 253 S.W.3d at 243. Likewise, although the activation of emergency lights is a factor in the analysis, it is not dispositive, especially when, as in the present case, the lights were not activated to detain an actively moving vehicle. *See Franks*, 241 S.W.3d at 142. Deputy Dollison did not activate his lights until shortly after Appellant walked to the front of his own vehicle and began making his way to the patrol unit. The lot was located in a rural area with extensive tree cover and was unlit.

Nevertheless, the deputy stated that as Appellant moved to the front of his vehicle, he determined that the car was not the one involved in the copper thefts. Appellant argues that the detention should have terminated at that moment, that the deputy should have ceased interacting with Appellant, and that he should have left the scene. Even assuming Deputy Dollison detained Appellant at that moment, we conclude he was justified in doing so.

The evidence shows that late in the evening or early morning, while on patrol, Deputy Dollison made a U-turn to investigate and follow a vehicle he thought might have been used in criminal activity. Shortly after making the U-turn and catching up to the car, it turned into a driveway leading to a house that Deputy Dollison knew to be abandoned. Yet, the vehicle drove completely up the driveway. Appellant turned the engine off, exited the car, and immediately went towards the front of his car. Based on his training and experience, Deputy Dollison believed that this conduct was suspicious, and specifically he was suspicious that Appellant might be engaged in theft, burglary, or drug activity.

Appellant relies on *Klare v. State*, where the court noted that although relevant to the analysis, "[a] lawful stop must be based on more than a vehicle's suspicious location or time of day[, and that] courts generally require an additional fact or facts particular to the suspect's behavior to justify a suspicion of criminal activity." *Klare v. State*, 76 S.W.3d 68, 75 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd); *but see Tanner v. State*, 228 S.W.3d 852, 858 (Tex. App.—Austin 2007, no pet.) (criticizing analysis in *Klare*). Here, the evidence shows more than

6

just a suspicious location or time of day. Specifically, the evidence shows that shortly after the deputy made a U-turn, the vehicle turned into a lot in a rural area on which was located a house that the deputy knew to be vacant, Appellant quickly exited the vehicle, and then walked towards the front of his car in a suspicious fashion. Deputy Dollison was not required to ignore this information, and when considered together, these facts support a reasonable suspicion that criminal activity was afoot. Based on the totality of the circumstances, we conclude that Deputy Dollison could momentarily detain Appellant to investigate and either confirm or dispel his reasonable suspicion that Appellant was engaged in criminal activity. Immediately upon talking with Appellant, Deputy Dollison detected the odor of alcohol, and noticed that Appellant had slurred speech and bloodshot eyes. These observations allowed Deputy Dollison to further detain Appellant to investigate the suspected DWI. *See* ***Goudeau v. State***, 209 S.W.3d 713, 719 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating that if officer develops reasonable suspicion that another violation has occurred during valid detention, scope of initial investigation expands to include new offense).

Appellant's sole issue is overruled.

## DISPOSITION

Having overruled Appellant's sole issue, the judgment of the trial court is ***affirmed***.

**SAM GRIFFITH**
Justice

Opinion delivered January 16, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

**JANUARY 16, 2013**

**NO. 12-12-00140-CR**

**DUDLEY KRISSHAWN HICKMAN,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

---

Appeal from the 241st Judicial District Court

of Smith County, Texas. (Tr.Ct.No. 241-1237-11)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

8