# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-12-00120-CR

---

**Donita L. Iselt, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE COUNTY COURT OF LEE COUNTY**
**NO. 23034, HONORABLE PAUL E. FISCHER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

After the trial court denied her motion to suppress evidence and the trial on the merits began, Donita L. Iselt pleaded guilty to the misdemeanor offense of driving while intoxicated. *See* Tex. Penal Code § 49.04(b). The trial court assessed sentence at ninety days in jail, probated for two years. On appeal, she contends that the trial court erred in denying her motion to suppress because her interaction with the police officer was an investigative detention but the police officer lacked reasonable suspicion to detain her. We will affirm the judgment.

## BACKGROUND

Iselt filed broad motions to suppress statements and evidence, alleging in part that there was not sufficient cause for the initial detention. At the hearing on the motion to suppress, the court heard testimony from Giddings Police Sergeant Lacey Carvin and watched the video recorded from Carvin's patrol car. Carvin testified that, when driving past a bank at around 1:40 a.m., she saw a vehicle parked in the bank's lot with its headlights on and the engine running. The bank was

closed and the vehicle was not in a service lane. Sergeant Carvin parked her patrol car behind the vehicle and approached it, a flashlight in one hand. Iselt, the lone occupant of the vehicle, was asleep. Carvin knocked on the window and asked if Iselt would open the door. Carvin testified that Iselt had difficulty unlocking the driver's door and that Carvin may have helped her open the door. Carvin testified that when the door opened she could smell a very strong odor of alcohol. Carvin asked Iselt whether she was okay, what she was doing, and why she was sitting in the bank parking lot. Iselt said that she was waiting for her boyfriend to "unlock the door," though she did not specify what door or seem to know where she was. Another officer arrived and watched from the passenger side of the vehicle. Iselt struggled to locate her driver's license and made several garbled comments.

When asked on cross-examination if she had pulled her patrol car "right behind" Iselt's vehicle, Carvin responded "[b]ehind her, yes I did" to ensure the vehicle could not leave. In the video, the rear of Iselt's vehicle was visible while none of Carvin's patrol car appeared in the frame. Carvin could not remember whether she turned on her spotlight, but the video appears to show only her handheld flashlight shining. Carvin agreed that, when she asked Iselt to open her door, she felt that Iselt had to comply. Had Iselt walked or driven away, Carvin agreed that she would have detained or pulled her over.

Carvin administered field sobriety tests on which Iselt exhibited signs of intoxication. She showed all six clues of intoxication on the horizontal gaze nystagmus test, seven of eight clues on the walk-and-turn test, and could not stand on one leg for any length of time.

The trial court denied Iselt's motion to suppress.

2

**RELEVANT LAW**

Police can have different types of interactions with persons that involve different levels of justification and protection. *State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim App. 2002). These interactions include encounters, investigative detentions, and arrests. *Id.*

Encounters are consensual interactions between citizens and police that do not require reasonable suspicion and do not implicate constitutional rights. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Police may knock on closed doors, approach individuals on a street or in a public place, ask people if they will answer questions, and ask questions without violating the Fourth Amendment. *See Florida v. Royer*, 460 U.S. 491, 497 (1983). An interaction is an encounter if a reasonable person would feel free to disregard the police and go about his business. *Bostick*, 501 U.S. at 434; *California v. Hodari D.*, 499 U.S. 621, 628 (1991); *see also Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997).

Investigative detentions are interactions in which an individual is confronted by a police officer, yields to the officer's display of authority, and is temporarily detained for purposes of an investigation. *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). An investigative detention is a seizure that is reasonable, and thus constitutional, if (1) the officer's action was justified at the detention's inception, and (2) the detention was reasonably related in scope to the circumstances that justified the interference in the first place. *See Terry v. Ohio*, 392 U.S. 1, 19-20 (1968); *see also* U.S. Const. amend. IV. A police officer may stop and briefly detain a person for investigative purposes if, under the totality of the circumstances, the officer has reasonable suspicion supported by articulable facts that the person detained is, has been, or soon will be engaged in criminal activity. *See Terry*, 392 U.S. at 21; *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim.

3

App.2005). Whether reasonable suspicion exists is judged objectively based on the facts known to the officer at the time of the detention. *See Terry*, 392 U.S. at 21; *see also Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997).

The court of criminal appeals has described the considerations used in making the distinction between a mere encounter versus an investigative detention:

> Police officers may be as aggressive as the pushy Fuller-brush man at the front door, the insistent panhandler on the street, or the grimacing street-corner car-window squeegee man. All of these social interactions may involve embarrassment and inconvenience, but they do not involve official coercion. It is only when the police officer "engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen," does such an encounter become a seizure. It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth seizure. At bottom, the issue is whether the surroundings and the words or actions of the officer and his associates communicate the message of "We Who Must Be Obeyed."

*State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008). The court quoted with approval a commentator's statement regarding the line between encounter and detention:

> The officer may tap on the window and perhaps even open the door if the occupant is asleep. A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so. Likewise, the encounter becomes a seizure if the officer orders the suspect to "freeze" or to get out of the car. So too, other police action which one would not expect if the encounter was between two private citizens—boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority—will likely convert the event into a Fourth Amendment seizure.

*Id.* (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 427 (4th ed. 2004)).

In *Garcia-Cantu*, a police officer investigated a truck parked at the end of a dead-end street at 4 a.m. *Id.* at 244-45. The officer turned on his spotlight and video camera before stopping his patrol car. *Id.* at 245. He parked about ten feet behind the truck, effectively preventing it from leaving. *Id.* at 246. The officer held his large flashlight with both hands at shoulder level and approached the driver's side of the truck "in a manner that could be described as authoritative." *Id.* at 247-48. When the driver got out of the vehicle, the officer asked "What are you doing here?" The court of criminal appeals determined that the trial judge could have concluded, based on the officer's tone and demeanor both on the stand and in the video recording of the interaction, that "the officer's questioning was more in the nature of an official command rather than a friendly or neutral inquiry." *Id.* at 248. The officer then tracked the passenger's exit with his flashlight, played his flashlight across and into the driver's eyes as if checking for intoxication, did the same to a person who came from a nearby house, and asked if the driver had any identification. The driver testified that he did not feel free to leave or terminate the encounter. *Id.* at 248-49. While the driver's testimony was not dispositive of whether a reasonable person in his position would have felt the same, the court of criminal appeals concluded that it was "hard to conclude that any reasonable person would feel free to drive or walk away or to terminate the questioning." *Id.* at 249.

A panel of this Court similarly charted the evolution of a defendant's interaction with police from encounter to detention to arrest. *Franks v. State*, 241 S.W.3d 135 (Tex. App.—Austin 2007, pet. ref'd). In that case, a police officer noticed a vehicle parked at a rest area over the course of two days. *Id.* at 139. He decided to check the welfare of anyone in the vehicle. He parked his patrol car behind the vehicle and, when the dome light inside the other vehicle was switched off, he turned on his patrol car's overhead lights to illuminate the darkened area. He approached the vehicle

5

(which had its engine running) and introduced himself to the driver, who was crying and nervous and asked several times if she could leave. The officer said that she could not go because he wanted to find out what was wrong. *Id.* This Court concluded that the interaction between officer and driver was an encounter until he told her she could not leave. *Id*. at 142. Parking behind her did not detain her because nothing in the record showed that he prevented her from leaving. The siren was not activated, the officer did not issue commands over the loudspeaker, and he did not tell her to turn off the engine. Activating the overhead lights to illuminate the rest area did not constitute a detention. *Id*. But because the police officer had not observed facts supporting a reasonable suspicion of wrongdoing before he detained Franks, a panel of this Court concluded that the detention was not reasonable. *Id.*

The outcomes of *Garcia-Cantu* and *Franks* appear to have been largely driven by their resolution at trial. The court of criminal appeals deferred to factual findings that supported the trial court's grant of the motion to suppress (*Garcia-Cantu*, 250 S.W.3d at 241, 245), while this Court was required to defer to fact-findings that supported the trial court's denial of the motion to suppress. *Franks*, 241 S.W.3d at 140.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). At a suppression hearing, the trial court is the sole finder of fact and can believe or disbelieve any or all of the evidence presented. *Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007). We give almost total deference to the trial court's determination of historical facts, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We afford the same amount of deference to the trial court's application of the law to facts if the

resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id*. We review de novo the trial court's application of the law to facts if resolution of those ultimate questions does not turn on an evaluation of credibility and demeanor. *Id*.

**DISCUSSION**

Iselt contends that the trial court erred in overruling her motion to suppress because the interaction between her and Carvin was an investigative detention and because Carvin lacked reasonable suspicion to detain her.

Carvin parked her patrol car behind Iselt's vehicle, which itself was parked head-in to a curbed parking space. This is more like the circumstances of *Garcia-Cantu* than the situation in *Franks* in which the driver was free to pull forward. *Compare Garcia-Cantu*, 250 S.W.3d at 246, *with Franks*, 241 S.W.3d at 142. Although Carvin testified that she would have pursued Iselt had she fled, Carvin did not make that known to Iselt before she opened the door. Carvin did not turn on her patrol car's overhead lights, tell Iselt she was under arrest, or command her to do anything. Before Iselt opened the door, Carvin knocked on the window and said, "Can you open the door? Hi," in what the trial court could have concluded was a non-threatening tone of voice. This initial interaction stands in stark contrast to the authoritative and commanding approach used by the officer in *Garcia-Cantu*, 250 S.W.2d at 247-48. Iselt then opened her door, releasing the "very strong" odor of alcohol, and shortly thereafter manifested other indicia of intoxication like slurred speech and unclear thinking that plainly justified Carvin's detention.

The test is not what the officer subjectively and secretly believed regarding the defendant's freedom to leave, nor is it what the defendant believed about her freedom to leave, but whether a reasonable person in the defendant's position could feel free to disregard the officer

7

and go about her business. *See Bostick*, 501 U.S. at 434. Despite Carvin's expressed intent in the placement of her patrol car, it is not clear based on the video that a person in Iselt's position would have been aware that her vehicle's mobility was constrained. Despite Carvin's testimony that she would have impeded any attempt by Iselt to leave, Iselt's door opened and she exuded a very strong odor of alcohol before Carvin communicated an intent to detain Iselt for further investigation. The odor of alcohol, Iselt's slurred speech, and her equilibrium issues quickly added sufficient evidence to support a reasonable suspicion that Iselt had committed the offense of driving while intoxicated.

We find no error in the trial court's implicit determination that the interaction was initially an encounter before Iselt opened her door, meaning that no evidence supporting a reasonable suspicion of wrongdoing was needed before that time. We also find no error in the trial court's implicit determination that, once the door to Iselt's vehicle opened, the evidence known to Carvin supported a reasonable suspicion of wrongdoing that justified an investigative detention. We overrule Iselt's points of error.

## CONCLUSION

Having overruled Iselt's points of error, we affirm the judgment.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton, and Rose

Affirmed

Filed:  May 2, 2014

Do Not Publish

8